# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 15, 2015

Lyle W. Cayce
Clerk

No. 13-10014

BNSF RAILWAY COMPANY, formerly The Burlington Northern and Santa Fe Railway Company, as successor by merger to Burlington Northern Railroad Company and The Atchison Topeka and Santa Fe Railway Company,

Plaintiff – Appellee

v.

UNITED STATES OF AMERICA,

Defendant – Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, OWEN, and HIGGINSON, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

### *ON PETITION FOR REHEARING*

Treating the petition for rehearing en banc as a petition for panel rehearing, the petition for rehearing is GRANTED. We WITHDRAW our earlier opinion, *BNSF Railway Company v. United States*,[1] in its entirety, and SUBSTITUTE the following:

---

[1] 745 F.3d 774 (5th Cir. 2014).

No. 13-10014

BNSF Railway Company ("BNSF") filed suit seeking refunds of certain taxes that it, and its predecessor companies, paid pursuant to the Railroad Retirement Tax Act ("RRTA"). BNSF claimed that it overpaid when it included (i) Non-Qualified Stock Options ("NQSO"), and (ii) certain moving expenses as taxable compensation. The parties stipulated to the facts and, on cross-motions for summary judgment, the district court granted summary judgment in favor of BNSF on all its refund claims. We REVERSE.

## I.

BNSF is a rail carrier[2] that operates an international railroad system consisting of approximately 32,000 miles of rail throughout the Western United States and Canada. BNSF was formed by the 1996 merger of The Atchison Topeka and Santa Fe Railway Company with the Burlington Northern Railroad Company.[3] At issue in this case are (i) Burlington Northern Railroad Company's 1993, 1994, and 1995 tax years; (ii) The Atchison Topeka and Santa Fe Railway Company's 1994 and 1995 tax years; and, (iii) BNSF's 1996, 1997, and 1998 tax years.

As a rail carrier, BNSF and its employees are subject to the Railroad Retirement Tax Act ("RRTA").[4] BNSF now seeks a refund of the employer and employee portions of taxes paid on the exercise of NQSOs and certain moving expenses.

## A.

During the tax years at issue, BNSF offered salaried employees and executives a combination of Incentive Stock Options ("ISO")[5] and NQSOs. The

---

[2] As defined by Part I of the Interstate Commerce Act, 49 U.S.C. § 3(a) and 26 U.S.C. § 3231(g).

[3] The companies are collectively referred to as BNSF.

[4] 26 U.S.C. §§ 3201 *et seq.*

[5] The taxation of the ISOs is not at issue. An employee does not recognize income on the grant or exercise of an ISO. When the stock acquired by the exercise of the ISO is disposed of, the employee must recognize capital gain, as measured by the difference between the

No. 13-10014

stated purpose of the stock option plans was to provide employees with a competitive compensation package.[6]  At the time the stock option plans were adopted, BNSF paid its employees and executives salaries that were below industry average, but because of the stock option plans, provided an overall compensation package that was above industry average.[7]  Each year, BNSF's Board of Directors determined the number of stock options to grant.[8]  Once the number was determined, BNSF awarded stock options in part as compensation for services rendered by employees and in part as an award for job performance.[9]  These options were then awarded as either ISOs or NQSOs.[10]  Additionally, BNSF's Board of Directors determined the final deadline for exercising the options and the vesting period for each option grant.[11]

When an employee exercised a NQSO, the employee would pay the price for the share that was the market price on the day the option was granted (the "strike price").[12]  Approximately 90-95% of the time, the employee would then sell the share at the same time, such that the employee would only receive the difference between the strike price and the exercise price.[13]  Alternatively, the employee could keep the stocks, either by paying the broker the strike price when executing the option or by selling enough stock to cover the strike price and taxes, and then keeping the remaining shares.[14]

---

strike price and the disposition price.  *See* 26 U.S.C. § 421.  To qualify for favorable tax treatment, either (i) the option must be held for at least two years from the date of the grant or (ii) the stock must be held for at least one year from the date of exercise.  *See id.* at § 422(a)(1).  A premature exercise or sale is a "disqualifying disposition" and any income from such a disposition is treated as ordinary income.  *See id.* at § 421(b).

[6] First Stipulation of Fact, ¶ 68.

[7] *Id.* at ¶ 69.

[8] *Id.* at ¶ 70.

[9] *Id.* at ¶ 71-72.

[10] *Id.* at ¶ 73.

[11] *Id.* at ¶ 75.

[12] *Id.*

[13] *Id.* at ¶ 11.

[14] R. 995–96.

No. 13-10014

NQSOs were exercised in one of two ways: (i) non-executive employees exercised their NQSOs through BNSF's transfer agent,[15] and (ii) executive employees were permitted to use their private brokers to exercise their NQSOs.[16]   Non-executive employees would either fax or hand-deliver an exercise notification sheet to BNSF's compensation department, who would then authorize BNSF's transfer agent to exercise the option.[17]   The transfer agent would then either forward the stock certificate to the employee or disburse the net gain amount on the sale of the stock.   For executives, the transfer agent would directly transfer the purchased shares to the executive's private broker.[18]

BNSF did not directly pay cash or send the stock certificate to the employee, but it did record all transaction information into a stock option tracking system.   BNSF would calculate the amount of RRTA taxes due and would inform the transfer agent of the amount of tax to be withheld.[19]

During the years at issue, 3,192 BNSF employees exercised NQSOs, representing $348,805,183.03 total spread on exercise.[20]   BNSF and its employees paid a total of $16,432,583.01 in RRTA taxes on exercised NQSOs.[21]

**B.**

From 1994 to 1996, many BNSF employees were required to relocate as a result of the consolidation and restructuring of operations, the merger, and employee promotions and transfers.[22]  Whenever BNSF asked an employee to move, it would pay a substantial portion of the moving expenses.[23]  In total,

---

[15] R. 952 n3.
[16] R. 988–89.
[17] R. 989.
[18] R. 990.
[19] *Id.*
[20] *Id.*
[21] R. 987.
[22] R. 991.
[23] R. 971.

BNSF paid approximately $135,000,000 in employee moving expenses during the period at issue.[24]

These payments were made pursuant to a written policy in BNSF's relocation manuals for non-union employees and pursuant to collective bargaining agreements for union employees.[25]  Typically, BNSF paid moving expenses in one of two ways: (i) by direct payment to the service providers, or (ii) by a lump sum payment to employees, who could generally keep any excess payment over expenses actually incurred and who were not required to provide substantiation.[26]  When BNSF paid a lump sum, it typically did so through a third-party agent hired by BNSF to administer the moving-expenses benefit program.[27]  The lump sum payments were calculated by using a benchmark based on average reimbursement amounts paid by similarly situated companies.  Typically, the lump sum payment was $20,000 for homeowners and $10,000 for non-homeowners.[28]  Additionally, BNSF generally paid employees a 'tax gross-up' to cover additional tax due on these moving expense benefits.[29]

BNSF considered certain moving expenses to be properly excluded moving expense payments and reimbursements under 26 U.S.C. § 217.  BNSF did not withhold federal income tax or RRTA employment tax on these expenses, and accordingly, these expenses are not at issue.[30]  BNSF provided a number of other moving expense benefits that were not excludable under § 217, including: professional relocation company expenses, babysitting expenses, car rental expenses, home sale costs (including appraisals, title

---

[24] R. 976.
[25] R. 991.
[26] Stipulations of Fact, ¶ 80; Plt.'s Mot. Summ. J. Exh. 112.
[27] *Id.*
[28] Def.'s Mot. Summ. J., Exh. J.
[29] *Id.*
[30] Stipulations of Fact, ¶ 78.

searches, and inspections), meals, pest extermination, pet relocation services, personal property storage, and reimbursement for lease cancellation fees.[31] BNSF claims that these expenses were not provided as compensation for employees' services to BNSF, but instead were provided as a means of retaining qualified and knowledgeable employees.[32]   In short, BNSF claims that without these moving expense benefits, employees would have been unable to relocate and thereby forced to resign.  Accordingly, BNSF claims that these benefits were paid to stay competitive.

## C.

From 1993 to 1998, BNSF, and its predecessors-in-interest, filed refund claims for both the employer and employee portions of the RRTA tax paid on NQSOs exercised during that time period.[33]  Additionally, BNSF filed formal refund claims for the employer portion of tax paid on moving expenses for 1994 through 1998,[34] as well as the employee portion for 1994, 1995, and 1998.[35] The Internal Revenue Service ("IRS") granted the refund claims for the employer portion of the RRTA tax paid on moving expenses for 1996 through 1998, and although the IRS now claims those refunds were in error, the IRS does not seek recovery of those refunds as the relevant statute of limitations has expired.

With respect to the employee portions of tax paid on moving expenses for 1996 and 1997, BNSF did not file a formal refund claim.[36]  When BNSF amended its federal railroad retirement tax returns (Form CT-1) for tax years 1996 and 1997, it included an attachment stating that BNSF "is not requesting

---

[31] *Id.* at ¶ 80 (identifying 28 distinct moving expenses that BNSF paid).

[32] R. 992.

[33] R. 998.

[34] R. 949–50.

[35] *Id.*

[36] BNSF recently filed formal refund claims for these taxes on September 6, 2013. *See* Appellee's Rule 28.4 Letter (Sept. 6, 2013).

refund of the employee with this Form CT-1 . . . [h]owever, [BNSF] is separately filing a claim for refund of the employee taxes over-collected with respect to the above-described payments on a Form 843."[37]  Yet, BNSF never filed a formal claim for refund of these employee taxes on a Form 843 for either 1996 or 1997 prior to the filing of this suit.

On June 30, 2011, BNSF brought this suit in the district court, seeking refunds of the employer and employee portions of RRTA tax paid on NQSOs, the employer portion of RRTA tax paid on moving expenses benefits in 1994 and 1995, and the employee portion of RRTA tax paid on moving expenses in 1996 through 1998.  On cross-motions for summary judgment, the district court granted summary judgment in favor of BNSF.  In so doing, the district court held that NQSOs are not compensation for purposes of the RRTA, and that moving expenses are properly excluded from income under the RRTA.  Additionally, the district court held that BNSF provided sufficient notice to the IRS to warrant jurisdiction over the refund claims for employee taxes paid on moving expenses in 1996 and 1997.

## II.

"We review a district court's grant of summary judgment *de novo* and apply the same standards as the district court."[38]  Accordingly, "[s]ummary judgment is proper if the pleadings and evidence show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[39]

## III.

### A.

---

[37] R. 585, 591.

[38] *Hernandez v. Yellow Trans., Inc.*, 670 F.3d 644, 650 (5th Cir. 2012) (citing *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 163 (5th Cir. 2006)).

[39] *Id.* (citing Rule 56(a), Fed.R.Civ.P.).

Our resolution of the NQSO issue is informed by a brief history of the RRTA. Unlike most American employers and employees, rail carriers and their employees are subject to the RRTA instead of the Federal Insurance Contributions Act[40] ("FICA"). By the 1920s, nearly 80% of railroad workers were employed by rail carriers offering pensions.[41] These employer-provided pension plans were rife with problems such as inadequate funding, capricious terminations, and limited benefits for disabled employees.[42] Because the planned social security system would not provide benefits for work before 1937, and was not planned to pay benefits for several years thereafter, Congress intervened in the railroad retirement system in the 1930s by enacting the Railroad Retirement Act[43] ("RRA") and the RRTA.[44]

Like FICA, the RRTA imposes a tax on both employers and employees to fund the RRA's retirement and disability benefits.[45] Unlike FICA, there are two tiers of taxes and benefits under the RRTA and RRA. Tier I provides benefits and taxes in a manner almost identical to FICA and, in essence, is the social security analog for railroad workers; indeed, the Tier I rates are statutorily linked to FICA.[46] Tier II functions like a private pension plan and is essentially an extension of the system of railroad pension plans that then existed when the RRA and RRTA were enacted in the 1930s.[47] The Tier II benefits are tied to an employee's "earnings and career service."[48]

---

[40] 28 U.S.C. §§ 3101 *et seq.*

[41] *See* Kevin Whitman, *An Overview of the Railroad Retirement Program*, 68 Soc. Sec. Bulletin 2 (2008).

[42] *Id.*

[43] 45 U.S.C. §§ 231 *et seq.*

[44] *See* Whitman, *supra* n.41.

[45] *See, e.g., Std. Office Bldg. Corp. v. United States*, 819 F.2d 1371, 1373 (7th Cir. 1987).

[46] *See Hisquierdo v. Hisquierdo*, 439 U.S. 572, 575 (1979).

[47] *Id.* at 574.

[48] *Id.*

Under Tier I, the RRTA imposes "on the income of each employee a tax equal to the applicable percentage of the compensation received during any calendar year by such employee for services rendered by such employee."[49] Compensation is then defined as "any form of money remuneration paid to an individual for services rendered as an employee to one or more employers," subject to certain enumerated exceptions.[50]   In the applicable Treasury Regulation, the IRS has defined RRTA "compensation" as having "the same meaning as the term wages in section 3121(A) . . . except as specifically limited by the [RRTA.]"[51]   The parties sharply dispute whether NQSOs are "compensation" as used in the RRTA.

The Government argues that the term "compensation" and the phrase "any form of money remuneration" as used in the RRTA is inherently ambiguous.   Thus, the Government argues that the Treasury Regulation definition for "compensation", that is, that it should have the same meaning as "wages" under FICA, should be awarded *Chevron*[52] deference.   The Government notes that this definition supports the remedial purposes of the RRTA, and avoids rendering superfluous statutory exclusions from RRTA compensation.   Thus, in the Government's view, NQSOs are "compensation" because they qualify as "wages" under FICA.

In contrast, BNSF argues that "compensation" and "any form of money remuneration" are not ambiguous.   BNSF explains that the plain language meaning of "any form of money remuneration" is any form of "payment or compensation in cash or other medium of exchange authorized by governmental authorities."[53]   BNSF thus argues that NQSOs cannot qualify

---

[49] 26 U.S.C. § 3201(a).
[50] 26 U.S.C. § 3231(e)(1).
[51] 26 C.F.R. § 31.3231(e)-1(a)(1).
[52] *Chevron USA, Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837 (1983).
[53] Br. of Appellee at 21.

as money because they are not cash or other medium of exchange authorized by governmental authorities, and therefore, are not "compensation" under the RRTA.

To this end, the district court held that NQSOs are not "compensation" under the RRTA. The district court explained that:

> The common accepted meaning of the words 'any form of money remuneration' could reasonably be thought to include cash (whether coin or paper money or a combination of the two), or a paycheck drawn on an account of the employer at a financial institution, or a wire transfer of pay check funds to the employee's bank account, or script issued to an employee by an employer for use as the employer's company store. . . . There is no 'ordinary, contemporary, common meaning' of the words 'money remuneration' that would include receipt by such an employee of an NQSO or the financial gain realized by such an employee from a later exercise of the option.[54]

## B.

We disagree. In answering the question of what "compensation" and "any form of money remuneration" mean, we start with the familiar two-step framework set out in *Chevron v. National Resources Defense Council, Inc.*[55] First we must ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguous expressed intent of Congress."[56] In evaluating the clarity of Congressional direction, we apply the "traditional tools of statutory interpretation,"[57] including "text, structure, purpose, and legislative history."[58]

---

[54] R. 998-99.

[55] 467 U.S. 837 (1984). In *Mayo Foundation for Medical Education and Research v. United States*, 131 S. Ct. 704 (2011), the Supreme Court made clear that IRS regulations receive *Chevron* deference. *Id.* at 711-14.

[56] *Id.* at 842-43.

[57] *Id.* at 843 n.9.

[58] *Citizens Coal Council v. Norton*, 330 F.3d 478, 481 (D.C. Cir. 2003) (quoting *Pharm. Research & Mfrs. Of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001)); *see also City of*

No. 13-10014

Second, if we "determine[] Congress has not directly addressed the precise question at issue," we "do[] not simply impose [our] own construction on the statute."[59]  Rather, we must decide "whether the agency's answer is based on a permissible construction of the statute."[60]

### 1.

In applying the traditional tools of statutory interpretation to the phrase "any form of money remuneration,"[61] we bear in mind the Supreme Court's admonition that we cannot interpret these words in isolation, but "must interpret the statute as a symmetrical and coherent regulatory scheme."[62]  We start with the text.  The phrase "money remuneration" does not appear to us to have an ordinary, common-sense definition.  Moreover, while the word "remuneration" is broad, the modifier "money" must narrow it to some degree – the question is how far did Congress go in circumscribing the term?  Here, as the Supreme Court and our own court have recognized, dictionary definitions can be helpful in defining the parameters of statutory language.[63]

In using dictionaries to inform our *Chevron* analysis we must be cautious.  As our en banc court held in *Mississippi Poultry Association, Inc. v. Madigan*, we have rejected a "per se 'dictionary rule,'" where "[if] a dictionary (or dictionaries) contain more than one definition that makes some sense under

---

*Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1876 (Breyer, J., concurring in part and concurring in the judgment) ("[T]he statute's text, its context, the structure of the statutory scheme, and canons of textual construction are relevant in determining whether a statute is ambiguous.").

[59] *Chevron*, 467 U.S. at 843.

[60] *Id.*

[61] 26 U.S.C. § 3231(e)(1).

[62] *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

[63] *See, e.g., Mayo Found. for Med. Educ. & Res. v. United States*, 131 S. Ct. 704, 711 (2011) (recognizing that dictionary definitions can be employed at *Chevron* step one); *Rapanos v. United States*, 547 U.S. 715, 732-33 (2006); *Tex. Sav. & Comm. Bankers Ass'n v. Fed. Housing Fin. Bd.*, 201 F.3d 551, 555 (5th Cir. 2000) (relying on a dictionary definition to determine whether a statute is ambiguous at *Chevron* step one).

the statute, then it is ambiguous."[64]  We recognized then, and reaffirm now, that:

> [S]uch an approach would also effect a radical shift in power from Congress to administrative agencies, as follows: For the agency interpretation to trump Congress, the agency must be entitled to deference; for the agency to be entitled to deference, there must be ambiguity; if every word for which secondary and tertiary meanings are to be found in some English language dictionary is deemed to be ambiguous for *Chevron* purposes, essentially every non-technical word in every statute would have the potential of being ambiguous; consequently, the agency's choice of definition would trump Congress' word usage every time—subject only to the vague caveat that the agency's choice "makes some sense" under the statute.[65]

Nonetheless, so long as dictionary definitions are used only to illuminate true ambiguity, rather than to create ambiguity where no honest disagreement about meaning exists, such definitions may be employed.

With that qualifier in place, we recognize that dictionary definitions of "money" are less than helpful.  On the one hand, most dictionaries offer narrow definitions that confine "money" to "a medium of exchange,"[66] and define "medium of exchange" as "anything generally accepted as payment in a transaction and recognized as a standard of value."[67] On the other hand, other dictionaries define "money" more broadly as "assets or compensation in the form [of] or readily convertible to cash,"[68] "[a]ssets that can easily be converted

---

[64] 31 F.3d 293, 307 (5th Cir. 1994) (en banc).

[65] *Id.*

[66] *See, e.g.*, Merriam-Webster's Collegiate Dictionary 750 (10th ed. 1994) (defining "money" as "something generally accepted as a medium of exchange, measure of value, or a means of payment: as a: officially coined or stamped metal currency"); Black's Law Dictionary 1096 (9th ed. 2009) (defining "money" as a "medium of exchange currently authorized or adopted by a government as part of its currency").

[67] Black's Law Dictionary 1072 (9th ed. 2009).

[68] Webster's Third New International Dictionary 1458 (1993).

to cash,"[69] and "[c]apital that is invested or traded as a commodity."[70]   And when "money" is used as an adjective, rather than as a noun, it may carry a different meaning—such as, "of or pertaining to capital or finance"[71]—or it may simply be superfluous.[72]   While these definitions are not so conclusive as to resolve the issue, we recognize that they do suggest multiple meanings of the word "money."   Nor are contemporary sources, of which we have been able to find only a few which have used the phrase "money remuneration," determinative.   Some suggest that money remuneration refers to cash payments.[73]   Others, however, use money remuneration more generally, to refer to forms of compensation other than in-kind benefits.[74]

Second, we turn to the structure of the statute.   Here, section 3231(e)(1), which defines "compensation" as "any form of money remuneration," specifically excludes four classes of payments from falling within the definition of compensation: (1) health insurance payments made by or on behalf of the

---

[69] Black's Law Dictionary (9th ed. 2009).

[70] *Id.*

[71] Rand House Webster's Unabridged Dictionary 1241 (2d ed. 2001).

[72] *See* Bryan Garner, A Dictionary of Modern Legal Usage 571 (2d ed. 1995).

[73] *See, e.g.*, *Termination of Contracts of Employment of Salaried Employees and Technical Staff*, 35 Int'l Lab. Rev. 803, 819 (1937) ("[T]he words 'remuneration' and 'salary' are taken to mean the total income of the employee, including, in addition to the money remuneration, any other advantages and additional payments, namely, tips, percentages, discounts, premiums, free dwellings, and other similar benefits.").

[74] *See, e.g.*, Alexander Baykov, The Development of the Soviet Economic System: An Essay on the Experience of Planning in the U.S.S.R., at 43 (1947) ("As the purchasing power of money declined very rapidly, money remuneration began to play a much less important part in the total 'wages' of workers than the supply of bare necessities in kind.");   *Salaries of School-Teachers in Colonial America*, 28 Monthly Lab. Rev. 27, 31 (1929) ("Besides the money remuneration, the districts boarded the teachers."); *Employment and Unemployment*, 19 Monthly Labor Review 146, 174 (1924) ("If the agent is furnished subsistence, the cost thereof is deducted from his money remuneration."); *see also*, 2 Wisc. Stat. 2401 (E.E. Brossard, ed., 1923) ("Where an employee of the county receives board and maintenance in addition to money remuneration, the value of such board and maintenance forms part of his earnings and should be deducted from the amount of his exemptions . . . .").

employer,[75] (2) tips, (3) "an amount paid specifically . . . for travelling or other bona fide and necessary expenses,"[76] (4) other remuneration which would not be treated as wages under 26 U.S.C. § 3121(a)(5), a section of FICA which excludes from wages a defined list of "payment[s] made to, or on behalf of, an employee or his beneficiary."[77]     Given this structure, the statutory interpretation canon of *noscitur a sociis* is helpful.  This canon recognizes that "an ambiguous term may be given more precise context by the neighboring words with which it is associated."[78] In this context, the four excluded categories provide insight into the meaning of "any form of money remuneration": for the four terms must be of the sort that would have fallen within the bounds of the statutory definition of "money remuneration," had Congress not explicitly excluded them.  Here, the statute refers repeatedly in those exceptions to "payments –a more expansive term than currency or cash, which suggests in turn that "money remuneration" should be interpreted broadly.[79]

---

[75] 26 U.S.C. § 3231(e)(1)(i) ("[T]he amount of any payment (including any amount paid by an employer for insurance or annuities, or into a fund, to provide for any such payment) made to, or on behalf of, an employee or any of his dependents under a plan or system established by an employer which makes provision for his employees generally (or for his employees generally and their dependents) or for a class or classes of his employees (or for a class or classes of his employees and their dependents), on account of sickness or accident disability or medical or hospitalization expenses in connection with sickness or accident disability or death, except that this clause does not apply to a payment for group-term life insurance to the extent that such payment is includible in the gross income of the employee.").

[76] *Id.* § 3231(e)(1)(iii).

[77] *See id.* § 3231(e)(1)(iv) (excluding "any remuneration which would not (if chapter 21 applied to such remuneration) be treated as wages (as defined in section 3121(a)) by reason of section 3121(a)(5).")  Section 3121(a)(5) excludes from compensation "any payment made to, or on behalf of, any employee or his beneficiary," including trust payments, annuity payments, certain pensions, exempt government deferred compensation plan, and several other similar compensation metrics.

[78] *United States v. Stevens*, 559 U.S. 460, 474 (2010) (internal quotation marks omitted).

[79] In *United States v. Quality Stores, Inc.*, 134 S. Ct. 1395, 1400 (2014), the Supreme Court analyzed the scope of FICA's "wages" definition by using statutory exceptions.  *See id.*

No. 13-10014

Similarly, section 3231(e) contains a number of more general exclusions from "compensation," many of which mention non-cash benefits. For example: section 3231(e)(12) excludes ISOs from compensation, section 3231(e)(5) excludes non-cash employee achievement awards from compensation, and section 3231(e)(9) excludes the value of meals and lodgings provided to employees from compensation. In interpreting this section, we are bound by the canon that we ought not "interpret[] any statutory provision in a manner that would render another provision superfluous."[80] Given this canon, reading "money remuneration" as equivalent to cash payment, as BNSF posits, would render these non-cash exceptions to compensation meaningless.

Third, we look to the purpose of the RRTA. To begin, it is well-established that the RRTA and FICA are parallel statutes, and courts often look to FICA when interpreting the RRTA.[81] In general, under "the *in pari materia* canon of statutory interpretation, statutes addressing the same subject matter generally should be read as if they were one law."[82] Here, FICA uses an expansive definition of wages, defined as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash."[83] Given the similarities between the statutes, there is an argument that we ought read "compensation" in the RRTA

---

("That exception would be unnecessary were severance payments in general not within FICA's definition of 'wages.'").

[80] *Bilski v. Kappos*, 561 U.S. 593, 607-08 (2010).

[81] *See, e.g.*, *North Dakota State Univ. v. United States*, 255 F.3d 599, 604 (8th Cir. 2001) (noting that the RRTA is "the equivalent of FICA for railroad employees"); *Montana Rail Link, Inc. v. United States*, 76 F.3d 991, 993 (9th Cir. 1996) (noting that the RRTA "served as the functional equivalent" of social security "for railroad employers"); *Chicago Milwaukee Corp. v. United States*, 40 F.3d 373, 374 (Fed. Cir. 1994) (noting that the RRTA is similar to FICA); *Std. Office Bldg. Corp.*, 819 F.2d at 1373 (RRTA "is to the railroad industry what the Social Security Act is to other industries").

[82] *Wachovia Bank v. Schmidt*, 546 U.S. 303, 315-16 (2006) (internal quotation marks and citation omitted).

[83] 26 U.S.C. § 3121(a).

as generally commensurate with this definition.  Moreover, as the Supreme Court has recently reaffirmed, we must broadly interpreted "compensation" in the FICA context, in part to accomplish the remedial purpose of the statute,[84] suggesting we ought do the same here.  This is far from an inevitable read, however: we are equally bound by the canon that "[s]tatutory definitions control the meaning of statutory words,"[85] and given that the two statutes do use different ways of defining "compensation," this could indicate that we ought read RRTA to have a different, and narrower, definition of compensation than FICA.[86]  Nonetheless, that the purpose of the statute supports multiple interpretations does suggest the provision's ambiguity.

Finally, we turn to legislative history.[87]  The original 1934 Railroad Retirement Act used the term "compensation," without further definition.[88] When that act was declared unconstitutional, Congress separated the taxing and benefit statutes, and the 1935 iteration of the taxing statute[89] defined "compensation" as "any form of money remuneration for active service, received by an employee from a carrier, including salaries and commissions, but shall not include free transportation[.]"[90]  The use of the phrase "any form of" and the specific exclusion of free transportation in this iteration suggests that Congress understood "money remuneration" to encompass non-cash

---

[84] *See, e.g.*, *United States v. Quality Stores, Inc.*, 134 S. Ct. 1395, 1399-1400 (2014); *Social Sec. Bd. v. Nierotko*, 327 U.S. 358, 364 (1964).

[85] *Burgess v. United States*, 533 U.S. 124, 129 (2008).

[86] There is also the general canon that "different words within the same statute should, if possible, be given different meanings." *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 991 (7th Cir. 2001).  This canon would also point toward different meanings, but given that we are comparing two different statutes, this principle is of less certain applicability.

[87] We recognize that the Supreme Court has spoken with skepticism about the use of legislative history, especially where, as here, it can lend itself to multiple meanings.  *See, e.g.*, *Exxon Mobile Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("[L]egislative history is itself often murky, ambiguous, and contradictory.").

[88] 48 Stat. 1283 (1934).

[89] 49 Stat. 974 (1935).

[90] *Id.* at § 1(d).

benefits.  Counseling against that conclusion is the fact that at the time the RRTA was enacted existing railroad pension plans were based on an employee's cash compensation only, rather than on other, broader types of compensation, despite the fact that some railroad companies apparently offered stock-option benefits.[91]  Given this tangled past, the best we can say is that legislative history does not decide the issue.

In light of the indeterminate text, structure, purpose, and legislative history of this statutory provision, we cannot conclude the Congress has "spoken clearly" as to the meaning of "money remuneration."[92]  We must proceed to *Chevron*'s second step.

**2.**

At *Chevron* step two we ask whether the IRS's definition "is based on a permissible construction of the statute."[93]  When answering that question, we must remember the limitations of our task: "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding."[94]

Treasury Regulation § 31.3231(e)-1 provides that the "term compensation [as is relevant for the RRTA] has the same meaning as the term wages in section 3121(a) . . . except as specifically limited by the [RRTA.]"[95]  Section 3121 provides that the term "'wages' means all remuneration for employment, including the cash value of all remuneration (including benefits)

---

[91] *See, e.g.*, Murray W. Latimer, *Industrial Pension Systems in the United States and Canada* 20-21, 30-31, 106-108 (1933 ed.); Nat'l Indus. Conference Bd., *Studies in Industrial Relations: Employee Stock Purchase Plans* 18-22 (1928).

[92] *City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1875 (2013) (Breyer, J., concurring in part and concurring in the judgment).

[93] *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

[94] *Id.* at 843 n.11.

[95] 26 C.F.R. § 31.3231(e)-1.

paid in any medium other than cash[.]"[96]  We conclude this interpretation is reasonable.   First, as discussed above, the statutory term "money remuneration" does not, as a textual matter, exclude the broader definition of compensation put forth by the regulation.  Second, the structure of the statute supports the regulatory interpretation: as discussed above, section 3231 excludes from the definition many examples of non-cash compensation, including, as is particularly relevant for these purposes, "qualified stock options."[97]  If "money remuneration" was narrowly defined, these provisions would be rendered redundant.   The IRS's regulatory action, which accommodates each of section 3231(e)'s enumerated exceptions, is reasonable.[98] Moreover, this analytical approach–and conclusion–is consistent with the Supreme Court's recent decision in *United States v. Quality Stores, Inc.*, where the Court, interpreting FICA's definition of "wages," looked to the surrounding exceptions to define the scope of the word.[99]

Next, the IRS's decision to interpret "compensation" in RRTA commensurate with FICA finds comfort in the "elementary principle of statutory construction that similar language in similar statutes should be interpreted similarly."[100]  As the Eleventh Circuit stated, "it is difficult to envision an act that more closely resembles [FICA] than does the [RRTA]."[101] While we recognize that both statutes use somewhat different formulations of

---

[96] 26 U.S.C. § 3121(a).

[97] *Id.* § 3231(e)(12).

[98] We recognize that there is an argument that this interpretation would render the "money" in "money remuneration" superfluous, at least if a narrow dictionary definition of money is used.  However, BNSF's proposed definition would render many of the section 3131(e) exceptions superfluous, and given these competing, imperfect constructions, we cannot say that the agency's interpretative choice is not reasonable, especially in light of the multiple ways in which "money remuneration" can be interpreted.

[99] 134 S. Ct. 1395, 1400 (2014).

[100] *United States v. Sioux*, 362 F.3d 1241, 1246 (9th Cir. 2004) (citing *Northcross v. Bd. of Educ. Memphis City Schools*, 412 U.S. 427, 428 (1973)).

[101] *Duckworth v. Allianz Life Ins. Co. of N. Am.*, 706 F.3d 1338, 1344 (11th Cir. 2013).

the word "compensation," the decision to interpret them together–which we have concluded the language of the statute allows–is not unreasonable.

Finally, we address one issue raised by the district court and brought to our attention again by BNSF.  The IRS regulation notes that compensation "has the same meaning as the term wages in [FICA] . . . except as specifically limited by the [RRTA]."[102]  The district court concluded that the term "money remuneration" represented a "controlling special limitation."[103]  We cannot agree.  As discussed above, we believe "money remuneration" is an ambiguous general term, and one which need not be understood as a special limitation, especially in light of section 3231's careful listing of twelve categories of specific exceptions.[104]

We hold that section 31.3231(e)-1's definition of "compensation" is a reasonable definition and thus NQSOs are properly taxed as compensation under the RRTA.

## IV.

## A.

We next turn to whether the claimed moving expenses are properly excluded from compensation under the RRTA.  We begin with the Government's argument that BNSF has failed to perfect its refund claims for the employee tax paid on moving-expense benefits in 1996 and 1997.  The Government first argues that BNSF's alleged informal claims for these years do not qualify under the informal claim doctrine as informal claims, and second argues that BNSF's failure to perfect the refund claims prior to filing suit requires dismissal of these refund claims.

---

[102] 26 C.F.R. § 31.3231(e)-1(a)(1).

[103] *BNSF Ry. Co. v. United States*, 904 F. Supp. 604, 614 (N.D. Tex. 2012).

[104] *See* 26 U.S.C. § 3231(e)(1)-(12).

No. 13-10014

We agree.  26 U.S.C. § 7422(a) provides a limited waiver of sovereign immunity that permits taxpayers to file suits seeking refunds.  Section 7422(a) provides that "[n]o suit shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously . . . collected . . . until a claim for refund or  credit has been duly filed with the Secretary[.]"  To be duly filed, (i) the claim must be filed within the time limits set by 26 U.S.C. § 6511(a)[105] and (ii) the claim must "set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof."[106]  A failure to comply with these requirements requires threshold dismissal.[107]

If a taxpayer fails to file a formal claim within the statutory time limits, the taxpayer's claim may still be preserved by the well-established informal claim doctrine.[108]  Under the informal claim doctrine, "an informal claim is sufficient if it is filed within the statutory period, puts the IRS on notice that the taxpayer believes an erroneous tax has been assessed, and describes the tax and year with sufficient particularity to allow the IRS to undertake an investigation."[109]  But even if the informal claim is timely, "the doctrine is predicated on an expectation that these formal deficiencies will at some point be corrected."[110]  This is because "[i]nformal claims have been likened to pleadings, for which technical deficiencies can generally be corrected by

---

[105] *See, Alexander Proudfoot Co. v. United States*, 454 F.2d 1379, 1382 n.6 (Ct. Cl. 1972).

[106] 26 C.F.R. § 301.6402–2(b)(1).

[107] *See United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 5–8 (2008); *United States v. Dalm*, 494 U.S. 596 (1990).

[108] *See PALA, Inc. Employees Profit Sharing Plan and Trust Agreement v. United States*, 234 F.3d 873, 877 (5th Cir. 2000) ("While its theoretical underpinnings remain shrouded in some obscurity, the informal claim doctrine has received the endorsement of the Supreme Court." (citing *United States v. Kales*, 314 U.S. 186, 194 (1941))).

[109] *Id.* (citing *Kales*, 314 U.S. at 194–95).

[110] *Id.* at 879.

amendment so as to relate back to the original date of filing suit."[111] Importantly, where courts have applied the informal claim doctrine, "the taxpayers followed their informal submissions with proper formal claims before initiating litigation."[112] Thus, a taxpayer's "subsequent failure to file a formal claim bar[s] the court from exercising any jurisdiction over the claim."[113]

Although the informal claims that BNSF filed for the employee tax paid on moving-expense benefits in 1996 and 1997 may satisfy the informal claims doctrine, it is undisputed that BNSF failed to perfect those claims prior to filing the present suit.  Accordingly, BNSF's refund claims for those years must be dismissed.

**B.**

We next turn to the merits.  The parties agree that certain moving expenses are properly excluded under § 3231(e)(5),[114] which provides that benefits excludable under § 132[115] are excluded from RRTA compensation.  BNSF argues that moving expenses not excludable under § 3231(e)(5) are properly excluded under § 3231(e)(1)(iii).  Section 3231(e)(1)(iii) provides, in pertinent part, that:

> [Compensation] does not include . . . an amount paid specifically—either as an advance, as reimbursement or allowance—for travelling or other bona fide and necessary expenses incurred or reasonably expected to be incurred in the business of the employer[.]

---

[111] *Id.*

[112] *Green-Thapedi v. United States*, 549 F.3d 530, 533 (7th Cir. 2008).

[113] *Id.*; *see also*, *PALA*, 234 F.3d at 877.

[114] Compensation "[s]hall not include any benefit provided to or on behalf of an employee if at the time such benefit is provided it is reasonable to believe that the employee will be able to exclude such benefit from income under [§ 132.]" 26 U.S.C. § 3231(e)(5).

[115] "[G]ross income shall not include any fringe benefit which qualifies as a . . . qualified moving expense reimbursement."  26 U.S.C. § 132.

No. 13-10014

BNSF explains that those moving expenses not excluded under § 3231(e)(5) should be excluded under § 3231(e)(1)(iii) because they were bona fide and necessary expenses incurred in its business.  BNSF states that these expenses were paid, not as compensation to employees, but as a means of retaining skilled and knowledgeable workers.

The district court agreed, holding that "BNSF has satisfied its summary judgment burden to establish that the relocation benefits in question were necessary to the business of BNSF . . . and were reasonably expected by them to be incurred."[116]  The district court explained that there was "no suggestion that any of those relocation benefits were not benefits actually or in reality provided for the employees in connection with employee relocations required by the business of the employer."[117]

The Government appeals this decision, arguing that because the RRTA provides a specific exclusion from moving expenses in § 3231(e)(5), it is not appropriate to include such expenses under the more general exclusion found in § 3231(e)(1)(iii).  Additionally, the Government explains that such a broad reading of § 3231(e)(1)(iii) would render the narrower exception under § 3231(e)(5) superfluous.

We agree, informed by two statutory interpretation canons: the specific-general canon and the rule against superfluities.  The specific-general canon applies where there is a specific statutory provision that would be subsumed by a general statutory provision.[118]  Here, § 3231(e)(5) provides a specific

---

[116] *BNSF Ry. Co. v. United States*, 904 F. Supp. 2d 604, 617 (N.D. Tex. 2012).

[117] *Id.* at 616.

[118] *See, e.g., Hinck v. United States*, 550 U.S. 501, 506 (2007) (describing the "well-established principle" that "a precisely drawn, detailed statute preempts more general remedies" (internal quotation marks and citations omitted)); *EC Term of Years Trust v. United States*, 550 U.S. 429, 433 (2007) (same); *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." (quoting *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974))).

exclusion for certain moving expenses, while § 3231(e)(1)(iii) provides a broader exclusion for travelling expenses and bona fide and necessary business expenses. Although § 3231(e)(1)(iii) could be read to include moving expenses, such a reading would subsume the specific exclusion for moving expenses; indeed, such a broad reading would subsume almost all the specific exclusions found in § 3231(e). For example, § 3231(e)(5) also excludes certain employee achievement awards.[119] If a rail carrier justifies an employee achievement award as bona fide and necessary to recruit and retain well-qualified employees in a competitive industry, then under the broad interpretation offered by BNSF, and accepted by the district court, such expenses would already be excluded under § 3231(e)(1)(iii). A similar problem arises under the rule against superfluities,[120] as the broad interpretation of § 3231(e)(1)(iii) renders virtually every exception in § 3231(e) inoperative.

We conclude that a more reasonable interpretation of § 3231(e)(1)(iii) permits exclusion of payments to employees for traveling expenses and bona fide and reasonable expenses related to travel, an interpretation harmonizing § 3231(e)(1))(iii) and § 3231(e)(5) as required by the specific-general canon and the rule against superfluities. To be sure, BNSF argues that the provisions can be harmonized under the broad interpretation by understanding § 3231(e)(5) to exclude items that benefit the employee, while understanding § 3231(e)(1)(iii) to exclude items that benefit the employer. Well stated, but the argument fails to persuade, as even such an understanding does not address a broad interpretation of § 3231(e)(1)(iii) rendering the remaining § 3231(e) exceptions inoperative.

---

[119] Section 3231(e)(5) excludes benefits reasonably excluded from income under § 74(c), which is an "[e]xception for certain employee achievement awards."

[120] *See, e.g., Colautti v. Franklin*, 439 U.S. 379, 392 (1979) (a cardinal rule of statutory construction is that "a statute should be interpreted so as not to render one part inoperative").

## C.

BNSF argues that even if the disputed moving expenses are not properly excluded under § 3231(e)(1)(iii), some of the disputed moving-expenses do not qualify as "compensation" under the RRTA, because they are provided as in-kind benefits. The district court did not address this argument, as it concluded that all of the moving expenses were properly excluded.

A review of the record makes clear that these disputed moving-expense benefits were paid in various ways, including: direct payment to the service provider, advances to the employee, reimbursements to the employee, and allowances to the employee. A determination will need to be made on an expense by expense basis as to whether the benefit qualifies as "compensation" under the RRTA.

On remand, the district court should parse the disputed moving expenses to determine (i) whether each disputed moving expense qualifies as "compensation" as explicated in Part III of this opinion, and (ii) whether each disputed moving expense may be properly excluded as a traveling expense, or a bona fide and reasonable expense related to travel.

## V.

For these reasons we REVERSE the district court and REMAND for further proceedings consistent with this opinion.