# United States Court of Appeals

### For the Eighth Circuit

_____

No. 16-3574

_____

Union Pacific Railroad Company, in its own capacity and in its capacity as
successor to Union Pacific Railroad Company

*Plaintiff - Appellant*

v.

United States of America

*Defendant - Appellee*

------------------------------

Association of American Railroads

*Amicus on Behalf of Appellant(s)*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: June 6, 2017
Filed: August 1, 2017

_____

Before WOLLMAN, ARNOLD, and GRUENDER, Circuit Judges.

_____

ARNOLD, Circuit Judge.

The Union Pacific Railroad Company seeks a refund of about $75 million in taxes that it paid the federal government from 1991 to 2007 under the Railroad Retirement Tax Act. UP maintains that the RRTA did not require it to pay taxes when it paid employees in stock or made what are called ratification payments to union-member employees. The district court rejected the refund requests and granted summary judgment to the government. We reverse and remand.

Anyone who has earned a paycheck in this country is probably familiar with the Federal Insurance Contributions Act, if not by name then by effect. The FICA requires employers to withhold a tax equal to a percentage of an employee's wages. 26 U.S.C. § 3102(a). In addition, an employer must pay a share of the tax. 26 U.S.C. § 3111(a). These taxes fund social-security and medicare benefits. *See United States v. Quality Stores, Inc.*, 134 S. Ct. 1395, 1399 (2014).

Rail carriers and their employees are not subject to FICA taxation; instead, they pay a somewhat different tax under the RRTA. *See* 26 U.S.C. §§ 3201, 3221(a)–(b). As its name suggests, RRTA taxes fund benefits under the Railroad Retirement Act. *See BNSF Ry. Co. v. United States*, 775 F.3d 743, 750 (5th Cir. 2015); 45 U.S.C. §§ 231–231v. Congress first enacted versions of the RRTA and the RRA in 1934 to stabilize the railroad industry's private pension plans during the Depression. Courts struck down that statute, *see R.R. Ret. Bd. v. Alton R.R. Co.*, 295 U.S. 330, 362 (1935), and its 1935 replacement, *see Alton R.R. Co. v. R.R. Ret. Bd.*, 16 F. Supp. 955, 958–59 (D.D.C. 1936), but Congress's 1937 version survived. Today, the RRA and RRTA resemble both a social welfare plan and a private pension program; one tier of benefits and taxes corresponds to what one would expect to receive from and to pay for social security and medicare, while the other tier ties benefits to earnings and career service. *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 574–75 (1979).

UP is a rail carrier that is obligated to pay RRTA taxes. During the time at issue, UP paid employees in company stock in addition to a monetary salary. UP paid

RRTA taxes on the stock payments, but now it asks the government to refund the money because, it says, the RRTA did not require it to make those payments. The government disagrees, arguing that employers who pay employment taxes under the FICA are obligated to pay taxes on stock payments, and the Internal Revenue Service, by regulation, treats the FICA and the RRTA the same on this matter. *See* 26 C.F.R. § 31.3231(e)–1(a)(1). The district court agreed with the government's interpretation of the statutes and regulations at issue, so it granted summary judgment in the government's favor and denied UP's motion for summary judgment, which judgments we review de novo. *Dunham v. Portfolio Recovery Assocs., LLC*, 663 F.3d 997, 1000 (8th Cir. 2011).

Generally, when Congress authorizes an agency to issue regulations interpreting a statute that the agency enforces, we defer to the agency's interpretation of an ambiguous statute so long as the interpretation is reasonable. We must first determine whether the statute is ambiguous, and if not, we apply the statute as written; if it is ambiguous, we must decide whether the agency's interpretation is reasonable. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2124–25 (2016).

Beginning, as we must, with the statutory text, *see Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1721 (2017), we see that the RRTA tax is based on an employee's "compensation," which is generally defined as "any form of money remuneration paid to an individual for services rendered as an employee to one or more employers." 26 U.S.C. § 3231(e)(1). On the other hand, the FICA levies a tax on an employee's "wages," which are "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash." 26 U.S.C. § 3121(a). It seems to us that the FICA sweeps more broadly than the RRTA: The FICA expressly mentions the cash value of remuneration not paid in cash, such as payments in property, whereas the RRTA does not. And the determiner "all" qualifies "remuneration" in the FICA definition, appearing to make

-3-

"remuneration" unlimited, whereas the word "money" qualifies "remuneration" in the RRTA.

But the parties dispute why the word "money" precedes "remuneration" in the RRTA. UP maintains that "money" takes on the ordinary meaning it had at the time the RRTA was enacted since the RRTA does not define it. Citing a handful of dictionaries, UP argues that "money" meant "a medium of exchange." UP notes that "money" can have a more restrictive meaning, such as referring only to cash or coins, but since the phrase "any form of" precedes the word "money," then it seems that Congress intended the RRTA to reach remuneration paid in any medium of exchange, not just cash or coins. To the government and the district court, on the other hand, "money" does not do any work; it is a superfluity, akin to its impotence in phrases like "money judgment" or "money damages." Alternatively, they point out, citing their own handful of dictionaries, that "money" can have an expansive meaning relating to capital or finance in general, especially when "money" does the work of an adjective.

We think that UP has the better argument. First, we are not convinced that the expansive definition of "money" that the government advances reflects the ordinary, common meaning of that term. *See Perrin v. United States*, 444 U.S. 37, 42 (1979). In fact, one of the dictionaries on which the government relies notes that in its "popular sense, 'money' means any currency, tokens, bank-notes, or other circulating medium in general use as the representative of value." *See* Black's Law Dictionary 1200 (3d ed. 1933). A number of contemporary legal authorities agree. UP points to an instructive case decided near the time that the RRTA was enacted in which a testatrix left her "money" to one person and her personal property to another. *In re Boyle's Estate*, 37 P.2d 841, 841 (Cal. Dist. Ct. App. 1934). The trial court awarded stock that the decedent had owned to the legatee of the "money." The appeals court reversed, noting that "[t]here is no doubt that the word 'money' when taken in its ordinary and grammatical sense does not include corporate stocks," and nothing

indicated that "money" was used "in any sense other than its ordinary and accepted meaning." *Id.* at 842. The court explicitly considered broader definitions of money but did not apply them. Our court, moreover, explained during that same era that "[t]he sole function of money is as a necessary medium of exchange in all commerce which has passed the barter stage," *Emery Bird Thayer Dry Goods Co. v. Williams*, 107 F.2d 965, 971 (8th Cir. 1939), which seems inconsistent with the notion that "money" in its ordinary context means any property whatsoever. More recently, the United States Tax Court said:

> A final problem we have with extending the definition of "money received" in section 1001(b) to encompass preferred stock is its great dissimilarity to money in any practical sense. Assuming without deciding that the term includes not only actual money, but "money equivalents" as well, it is difficult to see how stock of any sort could reasonably be viewed as such.

*Nestle Holdings, Inc. v. C.I.R.*, 94 T.C. 803, 814–15 (T.C. 1990). In short, "[t]here are numerous ways to define 'moneys,' but dictionaries mostly agree that the term refers to a generally accepted medium of exchange." *In re Hokulani Square, Inc.*, 776 F.3d 1083, 1085–86 (9th Cir. 2015).

Second, a regulation adopted about four months after the passage of the RRTA explained: "The term *compensation* means all remuneration in money, or in something which may be used in lieu of money (scrip and merchandise orders, for example), which is earned by an individual for services performed as an employee." Employers' Tax, Employees' Tax, and Employee Representatives' Tax Under the Carriers Taxing Act of 1937, 2 Fed. Reg. 2198, 2202 (Oct. 15, 1937) (codified at 26 C.F.R. § 410.5 (1938)). If money meant either nothing or all property, as the government asserts, then there would be no reason to note that scrip or merchandise orders also constituted "compensation." Those examples are illuminating only if "money" has a more restrictive meaning.

-5-

Third, consider the statutory context. Congress enacted the FICA's predecessor in 1935—the same year when Congress made its second attempt in passing the RRTA. In the 1934, 1935, and 1937 versions of the RRTA, Congress chose a different word—compensation—for the RRTA from the one it chose for the FICA—wages. These differences in the relevant terms call to mind the oft-cited principle that differences in statutory language convey differences in meaning. *Henson*, 137 S. Ct. at 1723. And when Congress does not adopt obvious alternative language, the natural implication is that it did not intend the alternative. *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017). Congress has, moreover, preserved the distinction. In defining the term "successor employers," the RRTA adopts the FICA definition except that Congress substitutes "compensation" (as the RRTA defines it) where the FICA says "remuneration." *See* 26 U.S.C. § 3231(e)(2)(C)(ii)—(iii). We think that Congress did this because "compensation," which includes only money remuneration, is necessarily a subset of "remuneration," which Congress uses in defining FICA "wages." It would make no sense for Congress to swap these terms if "compensation" meant the same thing as "remuneration" and "wages" under the FICA. And finally, the government and the district court propose an interpretation that raises a red flag: When interpreting a statute, courts typically do not presume that Congress has used superfluous words in its enactments. *Stapleton*, 137 S. Ct. at 1659.

The government insists, however, that various non-cash exemptions from the general definition of "compensation" show that "money remuneration" means something broader than just mediums of exchange or else the exemptions would be superfluous. Why would Congress, the argument goes, create exemptions for non-cash payments if the general definition already excluded those payments? The Fifth Circuit relied on this argument to conclude that the statute is at least ambiguous. *See BNSF*, 775 F.3d at 754–55. The government emphasizes that the Supreme Court took a similar analytical tack when interpreting the term "wages" under the FICA, so we should do so here. *See Quality Stores*, 134 S. Ct. at 1400.

-6-

We have no quarrel in general with the approach that the government suggests, and we recognize that the Supreme Court has used it—but in a different context. We decline to give it any weight here because it rests on a false premise in the RRTA context. None of the exemptions that the government identifies will be rendered superfluous under our reading of the statute because each can include payments consistent with a medium-of-exchange interpretation of "money." Take, for example, the exemption for remuneration in "qualified stock options," 26 U.S.C. § 3231(e)(12), that the government relies on as illustrating its point. That exemption says that "compensation" does not include any remuneration on account of a transfer or disposition of a share of stock as the result of an exercise of certain qualified stock options. (The parties here, by the way, agree that the options in question are non-qualified stock options.) The government contends that if, as UP suggests, "money remuneration" includes only remuneration paid in mediums of exchange like cash, then the exemption for non-qualified stock options adds nothing and is therefore superfluous. But what this argument omits is that cash payments sometimes accompany the exercise of a stock option, as, for instance, when the number of shares an employee can acquire at exercise is not a whole number, or if the remunerative program under which the option was transferred gives employees bonuses or additional compensation, in cash or other property, at the time of exercise. The IRS recognizes these possibilities. *See* 26 C.F.R. § 1.422–5(c). The government does not dispute UP's contention that money is sometimes received when a qualified stock option is exercised; instead, it questions why Congress would not also explicitly exempt non-qualified stock options. We think it is Congress's prerogative to give preferential tax treatment to certain kinds of options. The point is that the exemption for qualified stock options still has meaning even if we give "money" its ordinary meaning.

The government likewise calls our attention to the exemption for health and disability insurance, *see* 26 U.S.C. § 3231(e)(1)(i), but this exemption excludes from compensation "any payment . . . made to, or on behalf of, an employee . . . on account

of sickness or accident disability or medical or hospitalization expenses in connection with sickness or accident disability or death." Since this exemption covers cash payments made to an employee, it would not be rendered superfluous by interpreting "money" to mean mediums of exchange.

Another provision of relevance exempts "the value of meals or lodging furnished by or on behalf of the employer if at the time of such furnishing it is reasonable to believe that the employee will be able to exclude such items from income under section 119." *See* 26 U.S.C. § 3231(e)(9). Section 119 is the income-tax section relating to meals and lodging. It contains a subsection relating to money payments that an employee must pay an employer for employer-provided meals even if the employee declines the meal. *See* 26 U.S.C. § 119(b)(3). Section 119(b)(3) treats those circumstances for tax purposes as if the employer had never paid the employee that money. Because it is excludable under § 119, the cash payment to the employee is also excludable under the RRTA, so this exemption would retain meaning.

We consider, finally, the fringe-benefit exemption in § 3231(e)(5), which exempts "any benefit provided to or on behalf of an employee if at the time such benefit is provided it is reasonable to believe that the employee will be able to exclude such benefits from income under section 74(c), 108(f)(4), 117, or 132." But each of those sections includes a medium-of-exchange component. Section 74(c) excludes employee-achievement awards from income, but these awards can include some gift certificates, *see* 26 C.F.R. § 1.274–3(b)(2), which fall within the medium-of-exchange definition of money. Section 108(f)(4) is a loan-repayment program, which can include payments in mediums of exchange like cash. Section 117 deals with scholarships, which can involve cash payments. Finally, § 132 covers certain other fringe benefits, some of which involve cash payments, like moving-expense reimbursement and other cash reimbursements. In short, this exemption would still mean something under UP's definition of "money remuneration" because each of the cited sections includes a medium-of-exchange component. We are therefore not

convinced that UP's interpretation of "money" would mean that these exemptions would do no work.

The government points out that the FICA contains some of the same exemptions verbatim, presumably implying that the exemptions must have the same breadth in each of the tax schemes. We do not understand why this is necessarily so. The exemptions may apply to more transactions under the FICA, but that does not mean that they lack meaning under our interpretation of the RRTA. And though the payments by mediums of exchange may not be frequent in the circumstances to which those exemptions apply compared to payments made in other property, the point is that no exemption is empty of meaning.

Another reason that the exemptions do not do much to support the government's view is that they can be made to indicate that "money" is not as broad as the government suggests. The RRTA exempts cash tips under $20. 26 U.S.C. § 3231(e)(3). The FICA, on the other hand, exempts "tips paid in any medium other than cash" and cash tips under $20. 26 U.S.C. § 3121(a)(12). It is telling that Congress did not similarly exclude "tips paid in any medium other than cash" in the RRTA because this difference suggests that the general definition of "compensation" already excluded such tips.

Perhaps most important, Congress enacted the exemptions years after enacting the general definition of compensation. Under the government's theory, these later-adopted exemptions would impliedly repeal our reading of the original definition of "money remuneration." We do not favor a construction that later-enacted statutes impliedly repeal an earlier one unless the intention of Congress to repeal is clear and manifest. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662 (2007). The later statute must expressly contradict the earlier one, unless such a construction is absolutely necessary to give the words of the later statute any meaning. As just explained, the later-enacted exemptions have meaning, and

Congress never announced an intention to alter the original scope of "money remuneration" to something beyond a medium of exchange. We keep in mind what Justice Cardozo said about implied repeals: "We cannot believe that in this process of amendment the word 'seamen' lost the broad meaning that it had in the law to be amended, and was narrowed by the exclusion of a particular species of seamen, i.e., seamen having command. The change is too sudden to be accepted as intended unless unmistakably declared." *Warner v. Goltra*, 293 U.S. 155, 159 (1934). In short, we disagree that the statutory exemptions to the definition of "compensation" reveal much, if anything, about the meaning of "money remuneration."

We recognize that one of our sister circuits recently held that payments in stock are a form of money remuneration because stock has become practically equivalent to cash: "just as today 100 dimes is the exact monetary equivalent of a $10 bill," the court asserted, "so is a stock certificate that can be sold for $10." *Wis. Cent. Ltd. v. United States*, 856 F.3d 490, 492 (7th Cir. 2017). We respectfully disagree. Even stocks with readily ascertainable share prices are not "money" because they are not mediums of exchange. One cannot pay for produce at the local grocery store with stock. Like any type of property, stock does have cash value and can be exchanged for money, but we do not think it is a medium of exchange. The Seventh Circuit expressly rejected the idea that its holding rendered payments in any form of property taxable under the RRTA, noting that, for example, an employer would not have to pay RRTA taxes on a birthday cake. But as the dissent in that case recognized, *see id.* at 494 n.1, even a cake has market value and can be exchanged for money. We discern no limiting principle in the government's expansive interpretation that would prevent all property from being swept into the RRTA's text , so we decline to follow the Seventh Circuit's lead.

Finally, the government maintains that we should interpret the RRTA to reach as far as the FICA because the two statutes share a similar purpose. Vague notions about the statutes' purposes, however, cannot be used to override their actual texts.

*See Henson*, 137 S. Ct. at 1725. We also decline to wade into the policy pros and cons of construing the statutes differently or for not taxing remuneration in stock under the RRTA. Even if we thought that the government had the better of the policy arguments, we cannot look past the RRTA's plain language. *See Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1678 (2017). So we refuse the government's invitation to remove "money" from the books, either by erasing it entirely or by stretching it so wide that it encompasses everything, and suggest that the government is better off seeking an amendment of the statute from Congress.

Because we conclude that the RRTA unambiguously does not require payment of RRTA taxes on remuneration in stock, we owe no deference to the IRS's regulation defining the RRTA's "compensation" and the FICA's "wages" identically, and we reverse the district court's grant of summary judgment to the government and denial of UP's motion for summary judgment on this issue.

We turn now to the other broad issue in the case and consider whether the RRTA required UP to pay taxes when it made so-called ratification payments to employees when their unions ratified collective bargaining agreements. These payments were intended to encourage unions to ratify collective bargaining agreements; they typically required the recipient to be employed with UP on a certain date, and the amount paid out was tied to the number of hours that the employee had worked the previous year.

Everyone agrees that the ratification payments are "money remuneration." UP argues, though, that no tax is due under the RRTA because these payments are not "for services rendered" by the employee. *See* 26 U.S.C. § 3221(a)–(b). The RRTA says that a person "is in the service of an employer" if that person "is subject to the continuing authority of the employer to supervise and direct the manner of rendition of his service," "is rendering professional or technical services and is integrated into the staff of the employer," or "is rendering, on the property used in the employer's

-11-

operations, other personal services the rendition of which is integrated into the employer's operations." 26 U.S.C. § 3231(d)(1). The district court rejected UP's argument without referring to this statute; it drew, instead, from *Quality Stores*, where the Supreme Court interpreted the FICA as applying to wages paid for "not only work actually done but the entire employer-employee relationship for which compensation is paid." 134 S. Ct. at 1400.

We disagree with the district court's approach because instead of taxing payment for "services," the FICA taxes payment for "employment," which is defined broadly as "any service, of whatever nature, performed . . . by an employee for the person employing him." 26 U.S.C. § 3121(b). Transplanting the FICA's definition into the RRTA disregards the RRTA's focus on the authority and control that an employer exercises over an employee in determining whether the employee is performing a "service."

We conclude that the ratification payments were not made to employees for services rendered to UP because UP does not exercise control over whether a union ratifies a collective bargaining agreement. Indeed, ratification is a union activity that the Railway Labor Act protects from employer interference since that law is designed "to provide for the complete independence of carriers and of employees in the matter of self-organization." 45 U.S.C. § 151a(3).

The government also emphasizes that UP made the ratification payments from its payroll, which, it maintains, means they were "for services rendered." It is true that payroll payments are presumed to be compensation for services rendered. 26 C.F.R. § 31.3231(e)–(1)(a)(2). If the RRTA covered every payment that an employer made to an employee, then the payroll presumption would effectively be irrebuttable despite the regulation's admonition that it is not, and here UP has rebutted the presumption. First, because the unions' members were employed by several companies, UP simply used its payroll department to determine which union members

-12-

actually worked at UP rather than for a different company. UP further explained that its payroll department, unlike its accounts-payable department, was set up to withhold income taxes on the ratification payments.

The district court therefore erred in granting the government's motion for summary judgment and denying UP's motion for summary judgment because the RRTA did not require UP to pay taxes when it paid employees in stock or made ratification payments to them.

Reversed and remanded.

_____