# United States Court of Appeals

### For the Eighth Circuit

_____

No. 14-1265

_____

Avon State Bank

*Plaintiff - Appellee*

v.

BancInsure, Inc.

*Defendant - Appellant*

_____

No. 14-2202

_____

Avon State Bank

*Plaintiff - Appellant*

v.

BancInsure, Inc.

*Defendant - Appellee*

_____

Appeals from United States District Court
for the District of Minnesota - Minneapolis

_____

_____

Before GRUENDER, SHEPHERD, and KELLY, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

This action arises from an advance money scam involving a supposed multi-million dollar estate of a deceased African businessman. Avon State Bank (Avon) reached a settlement with two individuals who an Avon employee induced to invest in this scheme. Avon's insurer, BancInsure, Inc. (BancInsure), refused to provide coverage to Avon, asserting that the terms of a Directors' and Officers' Liability Policy (D&O Policy) and a separate Fidelity Bond (Bond) did not cover this event. The district court[1] granted BancInsure's motion for summary judgment in part, holding the D&O Policy did not provide coverage for this loss. The district court also granted Avon's motion for summary judgment in part, holding the Bond covered the loss and awarding prejudgment interest to Avon. BancInsure appeals and Avon Bank cross-appeals. We affirm.

I.

In 2007, a long-time Avon customer, Ambrose Herdering, was contacted by a man purporting to be the son of an African associate with whom Herdering had done business. This individual identified himself as "David Gibson" and claimed his father had passed away, leaving a $9 million estate in Africa. He informed Herdering that the family wanted to transfer the funds to the United States, and in particular to the

_____

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

bank Herdering used, Avon. Gibson claimed the money was tied up in the Netherlands and transferring the funds to the United States required up-front payments of taxes and other fees. Herdering sent Gibson money for these expenses and continued to send money as Gibson claimed problems and delays required additional funds.

Herdering approached Robert Carlson, an Avon Assistant Vice President and Loan Officer, and asked for his help in transferring the estate to the United States. Herdering promised Carlson huge returns in exchange for his help. In the summer of 2007, Carlson issued Herdering a loan from Avon and contributed $60,000 of his own money, all of which was to be used in transferring the estate. When Carlson made the loan to Herdering, Avon's President, Glenn Diedrich, contacted Herdering and expressed his concern that the estate might be a scam. Although Diedrich was aware of the loan, he remained unaware of Carlson's personal contribution.

In October 2007, Gibson requested that Herdering and Carlson cover half of a $750,000 tax on the estate. Carlson, who at this point had received no return on his investment, expressed his concern to Herdering that the investment might be a scam, writing in a letter: "[N]ow that this looks to be impossible, are you sure you really know these people?" Despite Carlson's concern, he recruited Donald Imdieke and Mike Froseth to secure the additional funds. Carlson informed Imdieke and Froseth of the investment opportunity, promising them they could double their money within a matter of weeks and assuring them he was "100 percent sure that it was legit." Carlson led both Imdieke and Froseth to believe that Avon itself was investing the money, rather than the men individually, by having both men write checks payable to Avon. Froseth contributed $405,000 while Imdieke contributed $80,000.

Carlson deposited Froseth's check and wired the money to the "Otua Auto Company"[2] account at the "Taipei Fubon Bank" in Hong Kong. This was in violation of Avon policy that prohibited the wiring of money on behalf of individuals who were not customers of the bank. Carlson told Avon's Vice President and Auditor, Rose Blascziek, that the people requesting the wire would not receive their merchandise if Blascziek did not approve the wire. Based on this misrepresentation, Blascziek approved the wire. Carlson held Imdieke's check while waiting for confirmation of the wire transfer of Froseth's funds. He attempted to contact the bank in Hong Kong to confirm both the transfer and the validity of the account. Despite never hearing back from the bank, Carlson still wired Imdieke's $80,000. Unsurprisingly, Herdering, Carlson, Froseth, and Imdieke never received their promised returns.

In January 2009, more than a year after Carlson wired Froseth's and Imdieke's funds, Froseth and Imdieke met with Diedrich about Carlson and these transactions. They showed Diedrich copies of their checks and demanded the return of their money. This was when Diedrich first learned that Carlson, Froseth, and Imdieke had invested in the scheme. He immediately notified BancInsure that he was concerned an employee might have been stealing from the bank. Diedrich suspended Carlson and ultimately terminated him. Avon sent both Froseth and Imdieke letters stating that it viewed any investment the men made as related to Carlson's personal dealings and not involving the bank.

Froseth and Imdieke continued to correspond with Avon and, in October 2009, they sent a letter to Diedrich threatening litigation based on deposits made relying on a bank officer's misrepresentations. Diedrich emailed a copy of this letter to BancInsure and told them he would keep them apprised of the situation. BancInsure acknowledged the notice of a potential claim and assigned the file to a claims-adjustment firm for investigation. Several months later, Diedrich inquired about

---

[2]The court notes with interest that "Otua" is simply "auto" spelled backwards.

coverage. BancInsure stated that it had not yet denied the claim as there was no claim at that time because there was not yet any lawsuit.

In May 2010, Froseth and Imdieke sued Avon for negligent and fraudulent misrepresentation. BancInsure agreed to provide coverage under the D&O Policy, rather than simply defend Avon in the action, and reserved its rights. At trial, Froseth and Imdieke dropped the claim for negligent misrepresentation and proceeded only with the fraudulent misrepresentation claim, alleging Avon was vicariously liable for Carlson's conduct. In January 2012, a jury returned a verdict in favor of Froseth and Imdieke, finding Carlson had breached his duty to disclose material information and had done so while in the scope of his employment with Avon. The court entered judgment against Avon and, while post-trial appeals were pending, the parties settled. Avon then gave BancInsure a Sworn Statement in Proof of Loss.

After the jury verdict, BancInsure informed Avon that its D&O Policy did not cover the loss because the policy excluded liability for fraudulent acts. BancInsure requested that Avon reimburse it for defense costs. Avon challenged the denial of coverage, asserting that the policy covered the judgment and defense costs and that the Bond also covered the loss.

Avon commenced this suit on October 5, 2012, asserting claims against BancInsure for breach of contract under both the D&O Policy and the Bond, for breach of implied covenant of good faith and fair dealing, and seeking declaratory judgment. BancInsure counterclaimed for breach of contract and declaratory judgment. Both parties filed motions for summary judgment on Avon's claims. The district court granted both motions in part and denied them in part, ultimately holding that the Bond covered the loss and the D&O Policy did not cover the loss. The district court also awarded Avon prejudgment interest.

BancInsure appeals, asserting that the district court erred in granting summary judgment to Avon and holding that the Bond covered the loss. BancInsure also asserts that the district court erred in its calculation of prejudgment interest. Avon cross-appeals, asserting that the district court erred in granting summary judgment to BancInsure and holding that the D&O Policy did not cover the loss.

II.

We first consider whether the district court erred in granting summary judgment in favor of Avon by holding that the Bond covered Avon's losses. We review a district court's grant of summary judgment de novo. Watkins Inc. v. Chilkoot Distrib., Inc., 719 F.3d 987, 991 (8th Cir. 2013). We will affirm the grant of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

BancInsure argues that the district court erred because the jury verdict against Avon did not constitute a "direct" loss under the terms of the Bond. The Bond requires BancInsure to indemnify Avon for any "[l]oss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others." BancInsure first argues that the loss was not "direct" because the Bond only afforded coverage for first-party losses and not for third-party losses. BancInsure contends that the language of the Bond does not encompass the situation that occurred here, where third parties suffered the loss resulting from employee dishonesty, rather than Avon itself suffering depletion of its own funds through employee actions like embezzlement. We disagree. First, under the loosely worded language of the Bond, no such limitation on third-party losses appears. The language of the Bond simply provides coverage for a loss "resulting directly from dishonest or fraudulent acts committed by an Employee," which precisely describes the loss Avon suffered through Carlson's fraudulent conduct. Second, under Minnesota law, which

governs this diversity action, courts recognize a distinction between an insured's loss of third-party property in its possession and theft committed against a third party by the insured's employee, allowing fidelity bond coverage for the former. See Cargill, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, No. A03-187, 2004 WL 51671, at *11 (Minn. Ct. App. Jan. 13, 2004) (unpublished) ("Although insurance typically covers third parties, for the purposes of a fidelity bond, '[t]hird-party claims arise only within this specific context: the employee acted dishonestly and property is taken from or lost by the insureds/employer that has custody of the property.'" (alteration in original) (quoting Aetna Cas. & Sur. Co. v. Kidder, Peabody & Co. Inc., 676 N.Y.S. 2d 559, 565 (N.Y. App. Div. 1998))); see also RBC Dain Rauscher, Inc. v. Fed. Ins. Co., 370 F. Supp. 2d 886, 890 n.3 (D. Minn. 2005) ("Cargill's claim was based not on loss of third-party property in its possession, as [this] claim is, but rather on theft committed against third-parties by its employees. The Cargill court . . . grasped the crucial difference, observing that the former is covered by fidelity insurance while the latter is not." (internal citations and quotation marks omitted)). Here, the Bond provides coverage because Avon suffered the loss of third-party property in its possession when Carlson wired Froseth's and Imdieke's funds from Avon to an unverified Chinese bank account. We therefore conclude this loss falls within the coverage of the Bond, in accordance with Minnesota law.

Second, BancInsure argues that the loss was not "direct" because Avon did not own or hold the funds and was not legally liable for them. The language of the Bond provides coverage for property "held by the Insured in any capacity" or "for which the Insured is legally liable." BancInsure maintains that Avon merely served as a conduit for the funds and thus did not satisfy the requirement that the funds be held by Avon for the Bond to cover the loss. We disagree. Avon held the funds, even if it did so fleetingly. In its legal context, "hold" means "to possess by a lawful title." Black's Law Dictionary 800 (9th ed. 2009). Avon possessed Froseth's and Imdieke's funds by a lawful title. Carlson solicited the money from Froseth and Imdieke, represented that Avon would be handling the money, obtained checks made payable

to Avon, deposited the checks into Avon's accounts, and wired the money out of Avon's accounts. This is sufficient to show that Avon held the funds for the purposes of Bond coverage, even if Avon did not hold the funds for an extended period of time. BancInsure urges us to adopt the definition of "held" from other jurisdictions, which have decided that an insured holds property when it exercises some degree of care, custody, or control of the funds, either by physical possession or some other manner. See, e.g., Loeb Props., Inc. v. Fed. Ins. Co., 663 F. Supp. 2d 640, 646-48 (W.D. Tenn. 2009). We decline to adopt this definition and instead rely upon the plain meaning of the word "hold." We note, however, that even under this more stringent definition, Avon held the funds because it had physical possession of the funds once Carlson deposited them into Avon's accounts. We therefore reject BancInsure's argument on this basis. Because we find that Avon held the funds, we need not determine whether Avon was legally liable for them.

Third, BancInsure argues that Avon's liability to third parties, Froseth and Imdieke, did not directly result from Carlson's fraudulent acts. BancInsure asserts that where a third party is the target of the employee's act, the insured-employer's liability for a loss does not directly result from the employee's actions. But, under Minnesota law, a loss of third-party funds entrusted to the insured through employee theft or fraud may be considered a loss "resulting directly from" the fraudulent acts of an employee. See RBC Dain Rauscher, 370 F. Supp. 2d at 890 (holding liability to a third party resulting from an employee's fraudulent conduct under the circumstances of this case constituted a direct loss to the insured employer); First Nat'l Bank of Fulda, Minn. v. BancInsure, Inc., No. 00-2002 DDA/FLN, 2001 WL 1663872, at *2 (D. Minn. Dec. 21, 2001) ("If a bank employee fraudulently seeks to benefit himself through acts that necessarily make the bank liable to a third party, the bank suffers a loss just as if the employee had taken the bank's funds for his own use." (citing First Am. State Bank v. Cont'l Ins. Co., 897 F.2d 319, 326 (8th Cir. 1990) (applying Iowa law))). The loss to Avon from Carlson's fraudulent conduct is a direct loss because Carlson acted fraudulently to benefit himself by protecting his

interest and did so through acts which would necessarily make Avon liable to third parties, Froseth and Imdieke.

Fourth, BancInsure argues that Carlson did not act with "manifest intent" to cause Avon to sustain a loss or to obtain an improper financial benefit to himself or another. Under the terms of the Bond, the employee must commit the fraudulent act with the requisite intent. This intent is defined as "manifest intent" "to cause the Insured to sustain such loss" or "to obtain improper financial benefit for the Employee or another person or entity." Minnesota case law defines "manifest intent" as when a person intends the natural consequences of his actions or omissions. First Nat'l Bank of Fulda, 2001 WL 1663872, at *2 (citing Transamerica Ins. Co. v. FDIC, 465 N.W.2d 713, 716 (Minn. Ct. App. 1991) aff'd in part and rev'd in part on other grounds, 489 N.W.2d 224 (Minn. 1992)). Here, Carlson acted with manifest intent to obtain improper financial benefit to himself because he committed the fraudulent acts to preserve his investment in the advance money scheme. The record is clear that Carlson sought the investments of both Froseth and Imdieke in an attempt to protect the $60,000 he already contributed of his own funds. This is evidenced by Carlson's correspondence with Herdering where he described continued plans to provide additional funds as "risky," but noted "[W]hat have we got to lose? Paying more tax is better than not getting anything out of this." We agree with the district court that "Carlson's actions and omissions plainly show he committed fraud in order to obtain an improper financial benefit."

Finally, BancInsure argues that, even if the Bond covered this loss, Avon did not satisfy the proof-of-loss and suit-limitations provisions. With respect to the proof-of-loss provision, BancInsure asserts that Avon did not provide a duly sworn proof of loss within six months of discovery, as required by the terms of the Bond. The Bond defines discovery in two ways: "when a director [or] officer . . . first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this Bond has or will be incurred" or "when a director [or] officer . . .

-9-

receives notice of an actual or potential claim in which it is alleged that the Insured is liable to a third party under circumstances which, if true, would constitute a loss under this Bond."

We agree with the district court that Avon provided a duly sworn proof of loss within six months of the earliest date on which it could have filed a proof of loss—the date when the exact amount of the judgment was entered, February 17, 2012. And, even if Avon did not comply, BancInsure suffered no prejudice from any delay in receiving proof of loss when it was well aware of the potential liability for the loss and was defending Avon in the underlying suit. Further, even if Avon could have provided proof of loss at an earlier date, BancInsure is estopped from asserting this requirement because it led Avon to believe the D&O Policy covered the loss and that pursuing coverage under the Bond was futile. Although the district court found BancInsure waived the proof-of-loss requirement, estoppel is the more appropriate legal principle when the basis for relieving Avon of this requirement is BancInsure's misrepresentation that the D&O Policy covered the loss. Compare L & H Transp., Inc. v. Drew Agency, Inc., 403 N.W.2d 223, 227 (Minn. 1987) (explaining that estoppel is appropriate when an insurer makes a misrepresentation upon which another party detrimentally relies and it would be "unjust, inequitable, or unconscionable" to allow the insurer to assert the defense), with Reliance Motor Co. v. St. Paul Fire & Marine Ins. Co., 206 N.W. 655, 656 (Minn. 1926) ("[W]aiver may be inferred from any words or conduct of the insurer's authorized officers or agents, evincing an intention on the part of the insurer not to insist on compliance with the requirements of the policy in respect to proofs of loss, and calculated to lead the insured to believe that they will not be insisted on."). Avon relied upon BancInsure's representation that the D&O Policy covered the loss to its detriment by failing to pursue coverage under the Bond. We therefore hold that BancInsure is estopped from asserting this requirement as a basis for denying coverage under the Bond.

With respect to the suit-limitation provision, BancInsure asserts that Avon did not commence the action within two years of the loss, only initiating this action in October 2012 when it was first aware of the loss, at latest, in October 2009. The district court determined BancInsure was estopped from asserting this defense. We agree. See L & H Transp., 403 N.W.2d at 227 (explaining estoppel is appropriate to bar an insurer from asserting time-limitation defense when insurer makes misrepresentations upon which the insured relies to its detriment). Estoppel is appropriate here for the same reasons it is appropriate with respect to the proof-of-loss requirement: BancInsure misrepresented to Avon that it would provide coverage under the D&O Policy and Avon relied upon this misrepresentation to its detriment by not pursuing coverage under the Bond. We therefore conclude that the district court did not err in granting summary judgment in favor of Avon on the basis that the Bond covered the loss.

## III.

Because we conclude that the district court did not err in holding that the Bond covered Avon's loss and the Bond provides complete coverage, we need not consider Avon's cross-appeal that the district court erred in granting summary judgment in favor of BancInsure on the basis that the D&O Policy did not cover Avon's loss. See Cross-Appellant's Br. 19 n.4 ("Affirming the district court's ruling concerning the Bond in all respects would moot Avon's cross-appeal.").

## IV.

We next consider whether the district court erred in its calculation of prejudgment interest awarded to Avon in its order on both parties' Rule 59(e) motions to alter or amend the judgment. We review a district court's ruling with respect to a

Rule 59(e) motion for abuse of discretion.[3] Perkins v. U.S. West Commc'ns, 138 F.3d 336, 340 (8th Cir. 1998). A district court abuses its discretion when it relies upon clearly erroneous factual findings or legal conclusions. Id. BancInsure argues that the district court erred by calculating prejudgment interest from the date Avon requested indemnification, rather than from the date Avon actually paid the settlement and defense costs, and thus allowed Avon to recover more than it was entitled to.

Under Minnesota Statute § 60A.0811:

> [a]n insured who prevails in any claim against an insurer based on the insurer's breach or repudiation of, or failure to fulfill, a duty to provide services or make payments is entitled to recover ten percent per annum interest on monetary amounts due under the insurance policy, calculated from the date the request for payment of those benefits was made to the insurer.

---

[3] The parties disagree on the standard of review. We note that our court has applied both an abuse-of-discretion and de novo standard of review to Rule 59(e) motions. Compare Roudybush v. Zabel, 813 F.2d 173, 178 (8th Cir. 1987) (citing Harris v. Ark. Dep't of Human Servs., 771 F.2d 414, 416-17 (8th Cir. 1985)) (applying abuse-of-discretion standard of review to Rule 59(e) motion), with Computrol, Inc. v. Newtrend, L.P., 203 F.3d 1064, 1069-70 (8th Cir. 2000) (applying de novo review to subject of Rule 59(e) motion). But "when faced with conflicting panel opinions, the earliest opinion must be followed, as it should have controlled the subsequent panels that created the conflict." Mader v. United States, 654 F.3d 794, 800 (8th Cir. 2011) (en banc) (internal quotation marks omitted). We find no cases applying a de novo standard of review that predate our cases applying an abuse-of-discretion standard. As such, we review this challenge to the Rule 59(e) motion for abuse of discretion. We note, however, that "where the Rule 59(e) motion seeks review of a purely legal question, '[l]ittle turns . . . on whether we label the review of this particular question abuse of discretion or de novo, for an abuse-of-discretion standard does not mean a mistake of law is beyond appellate correction.'" Henley v. Brown, 686 F.3d 634, 639 (8th Cir. 2012) (alterations in original) (quoting Koon v. United States, 518 U.S. 81, 100 (1996)).

Notably, the statute does not contain an "as otherwise provided by contract" exception that other prejudgment interest statutes under Minnesota law contain. <u>See, e.g.</u>, Minn. Stat. § 549.09 ("Except as otherwise provided by contract . . . preverdict . . . interest on pecuniary damages shall be computed as [follows.]").

The district court did not err in calculating prejudgment interest from the date when Avon first requested indemnification—January 12, 2012. The lack of an "except as otherwise provided by contract" exception in the language of Minnesota Statute § 60A.0811 renders BancInsure's argument that the language of the Bond dictates when prejudgment interest is to be assessed irrelevant. Further, case law from the District of Minnesota supports the conclusion that the language of the statute itself is unambiguous and should be applied as written. <u>See</u> <u>Owatonna Clinic-Mayo Health Sys. v. Med. Protective Co. of Fort Wayne, Ind.</u>, 714 F. Supp. 2d 966, 969 (D. Minn. 2010) ("The court determines that if the Minnesota Supreme Court were to interpret § 60A.0811, it would find that the statute is plain and unambiguous."). And our court has recognized the possibility of overcompensation when prejudgment interest is awarded pursuant to Minnesota law. <u>See</u> <u>Marvin Lumber & Cedar Co. v. PPG Indus., Inc.</u>, 401 F.3d 901, 918 (8th Cir. 2005) ("The prevailing party is fully compensated (indeed, more than fully compensated when preverdict interest is ordered on damages that were not incurred when suit was filed)."). All of these factors support the conclusion that the district court did not err in its calculation of prejudgment interest.

V.

For the foregoing reasons, the judgment of the district court is affirmed.

_____