# United States Court of Appeals

## For the Eighth Circuit

_____

No. 15-3355

_____

Michael D. Loos

*Plaintiff - Appellant*

v.

BNSF Railway Company

*Defendant - Appellee*

------------------------------

American Association for Justice

*Amicus on Behalf of Appellant(s)*

_____

No. 16-1123

_____

Michael D. Loos

*Plaintiff - Appellee*

v.

BNSF Railway Company

*Defendant - Appellant*

------------------------------

United States of America

*Amicus on Behalf of Appellant(s)*

American Association for Justice

*Amicus on Behalf of Appellee(s)*

_____

Appeals from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: June 6, 2017
Filed: August 3, 2017

_____

Before WOLLMAN, ARNOLD, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Michael D. Loos brought two claims against BNSF Railway Company: a retaliation claim under the Federal Railroad Safety Act ("FRSA") and a negligence claim under the Federal Employers Liability Act ("FELA"). The district court[1] granted BNSF summary judgment on the retaliation claim, but the negligence claim proceeded to trial where a jury rendered a verdict in favor of Loos. Loos appeals the grant of summary judgment to BNSF on his retaliation claim. BNSF cross-appeals denial of its motion to offset the amount of tax BNSF argues the Railroad Retirement

_____

[1] The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

Tax Act ("RRTA") requires it to withhold from the judgment on Loos's FELA claim. For the following reasons, we affirm both decisions.

## I. Background

Loos worked for BNSF for fifteen years as a conductor, brakeman, and switchman before BNSF fired him on November 29, 2012. During his employment, Loos made a number of safety reports, and he served on BNSF's site safety committee for an unspecified period in 2007 and 2008.[2] Between 2006 and his dismissal, Loos accumulated a number of attendance violations. The BNSF attendance policy allows each employee a certain number of absences during each three-month rolling period. If an employee exceeds the number of allowed absences during a given three-month period, BNSF disciplines the employee in accordance with a schedule of progressively increasing punishments. The first violation results in a formal reprimand, the second violation in a ten-day record suspension, the third in a twenty-day record suspension, and the fourth in a possible discharge. The employee also may be subject to dismissal, among other reasons, for having an active "Level S" violation (denoting a significant rule violation) on his record and accumulating three active attendance violations. Attendance violations remain active until the employee works one year without a new attendance violation. An employee may also request alternative handling, under which the employee agrees to participate in a plan designed to reduce future violations and, in return, does not receive an attendance violation.

Loos violated the policy twice in 2006, receiving first a formal reprimand, then a ten-day record suspension. In 2008, Loos violated the policy twice, receiving

---

[2]The record includes documents relating only to one safety report—a request Loos made in September 2007 for two defibrillators—but Loos testified he frequently filed safety reports and followed up with supervisors about them.

alternative handling and then a formal reprimand. After the second 2008 violation, Loos received a letter from his supervisor explaining that Loos worked between about thirty and forty hours per month during October and November of 2008 while his peers worked an average of 170 hours per month. The supervisor warned him that continuing to work less than full-time work hours would be considered an attendance violation. However, on June 15, 2009, Loos admitted another attendance violation and received a Level S ten-day record suspension. On March 22, 2010, Loos violated attendance rules by failing to notify a supervisor of the nature of a family-emergency absence within twenty-four hours and received alternative handling. That same month, Loos violated the attendance policy again and received a Level S thirty-day record suspension. BNSF then placed Loos on a three-year probation period during which "[a]ny rules violation . . . could result in further disciplinary action." Loos's attendance problems continued, and BNSF warned him in July 2010 that if he did not maintain full-time work hours, it would be considered another Level S violation.

On December 19, 2010, Loos twisted his knee when he fell into a snow-covered drainage grate in the train yard. He reported the workplace injury and missed work until May 16, 2011 when his orthopedist released him to work without restrictions. Later in May, Loos requested and was denied leave under the Family Medical Leave Act ("FMLA"), because he had not worked a sufficient number of hours in the previous year to qualify. The FMLA request did not include a statement from his doctor or any other form of medical documentation. In the summer of 2011, Loos requested to use the "injury on duty" ("ION") code to take excused absences due to flare-ups of his knee injury. His supervisor, Matt Bailey, initially responded that the ION code was not available to him because "[w]e don't do it anymore."[3]

_____

[3]The testimony of two former BNSF employees, Donald Mullins and George Joyce, suggests that BNSF may have stopped allowing the ION code for injury flare-ups after it instituted the attendance policy, possibly because of the belief that classifying such absences as injuries on duty could render them reportable under FRSA as separate incidents of injury on duty.

When Loos pressed him further, Bailey stated, "I won't authorize it, and that's the end of it." In his deposition, Bailey clarified that the ION code is available, but it requires medical documentation and clearance through the medical department—a policy, Bailey admitted, that is not written down and which he did not communicate to Loos. Later in 2011, Loos violated the attendance policy twice, and he received first a formal reprimand and then a ten-day record suspension. Loos testified in his deposition that at least one of these violations resulted from injury flare-ups, but he ultimately admitted the violations and waived his right to a formal investigation both times. After the second 2011 violation, BNSF placed Loos on a one-year review period.

In January 2012 Loos testified on behalf of two former co-workers, Paul Gunderson and David Peterson, in a hearing before a Department of Labor administrative law judge considering Gunderson and Peterson's claims against BNSF for retaliatory dismissal under FRSA.[4] BNSF authorized Loos's absence to testify, but, shortly after the hearing, it sent Loos an investigation notice relating to the day of work he missed to testify. In a related meeting, trainmaster Greg Jaeb, a supervisor, asked for a copy of the subpoena and stated that "this could be bad for you." It is unclear whether Jaeb was referring to Loos's testimony or to the effect of an attendance violation. BNSF did not ultimately require Loos to produce the subpoena and later canceled the investigation.

In the three-month period between May and July 2012, Loos missed eight-and-a-half weekdays and two weekend days. For that period, the attendance policy allowed him to miss only seven-and-a-half weekdays and no weekend days. He missed five days due to knee-injury flare-ups, two days (including Sunday, July 8) for personal reasons, and one-and-a-half days for a family emergency. During the three-

---

[4]This court considered Gunderson's claim earlier this year. *See Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 963 (8th Cir. 2017).

month period, Loos had requested and was denied permission to use the "ION" code to designate his knee-injury-related absences as excused. BNSF emphasized that it denied Loos's request because he did not provide medical documentation. BNSF issued an investigation notice in August 2012 and held a formal investigation on November 16, 2012. In the interim, Loos submitted a second FMLA request in September 2012, including a statement from his doctor. At the hearing, Loos submitted a note from his doctor dated November 6, 2012, explaining that he would have to miss work because of knee-injury flare ups and that these issues were present during May, June, and July of 2012. The BNSF investigator found that Loos had violated the attendance policy. Thus, as Loos had accumulated a total of three active attendance violations and an active Level S violation, BNSF dismissed Loos.

Loos filed suit on December 9, 2013, alleging that BNSF retaliated against him in violation of FRSA and that BNSF was liable under FELA for negligently causing his knee injury. The district court granted BNSF summary judgment on Loos's FRSA claim, but Loos's FELA claim proceeded to trial. The jury ruled in Loos's favor and awarded $85,000 for past pain, disability, and emotional distress; $30,000 for lost wages; and $11,212.78 for past medical expenses. BNSF moved under Federal Rule of Civil Procedure 59(e) for the court to offset the lost wages award by the amount of Loos's share of taxes owed under the RRTA. The district court found that no RRTA tax was owed on the award and denied BNSF's motion. In February 2016, BNSF partially satisfied the judgment, withholding from the payment the amount of the disputed RRTA taxes. Loos appeals summary judgment on his FRSA claim, and BNSF cross-appeals the district court's determination with respect to RRTA taxes.

## II. Discussion

## A. FRSA Retaliation Claim

"We review a district court's grant of a motion for summary judgment de novo, viewing all evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party." *Heim v. BNSF Ry. Co.*, 849 F.3d 723, 726 (8th Cir. 2017) (quotation omitted). "Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quotations omitted). FRSA provides that a railroad "may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done . . . to notify . . . the railroad carrier . . . of a work-related personal injury" or to cooperate with a federal investigation. 49 U.S.C. § 20109(a)(1), (4), (5). A railroad likewise may not "discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for . . . reporting, in good faith, a hazardous safety or security condition." *Id.* § 20109(b)(1)(A). We analyze FRSA retaliation claims in two steps. First, the plaintiff must make a *prima facie* case. *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014) (citing 49 U.S.C. § 42121(b)(2)(B)(i)). If the plaintiff satisfies this requirement, the railroad has the opportunity to demonstrate by clear and convincing evidence that it would have discharged the employee even if he had not engaged in protected activity. *Id.* (citing 49 U.S.C. § 42121(b)(2)(B)(ii)).

To make a *prima facie* case, Loos must demonstrate: that (1) "he engaged in protected activity"; (2) BNSF "knew or suspected, actually or constructively, that he engaged in the protected activity"; (3) "he suffered an adverse action;" and (4) "the circumstances raise an inference that the protected activity was a contributing factor in the adverse action." *See id.* The parties do not dispute that Loos engaged in protected activity of which BNSF was aware and that Loos suffered an adverse

action. Thus, we need only determine whether a genuine dispute exists as to the final prong—whether the circumstances raise an inference that Loos's protected activity was a contributing factor to his discharge. "[A] contributing factor is any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Id.* at 791 (quotation omitted). Though the employee need not "conclusively demonstrate the employer's retaliatory motive," *id.*, he must show that intentional retaliation prompted by a protected activity was a contributing factor, *Blackorby v. BNSF Ry. Co.*, 849 F.3d 716, 722 (8th Cir. 2017).[5] To determine whether the circumstances raise an inference of retaliatory motive in the absence of direct evidence, we consider circumstantial evidence such as the temporal proximity between the protected activity and the adverse action, indications of pretext such as inconsistent application of policies and shifting explanations, antagonism or hostility toward protected activity, the relation between the discipline and the protected activity, and the presence of intervening events that independently justify discharge. *See DeFrancesco v. Union R.R. Co.*, ARB No. 10-114, 2012 WL 694502, at \*3 (U.S. Dep't of Labor Feb. 29, 2012); *Gunderson*, 850 F.3d at 969. The court also takes "into account the evidence of the employer's nonretaliatory reasons." *Gunderson*, 850 F.3d at 969 (quotation omitted).

Loos argues that BNSF dismissed him in retaliation for one or more of three protected activities: (1) submitting safety reports and serving on the safety committee, (2) reporting an on-duty injury, and (3) testifying in the Peterson-Gunderson FRSA hearing. None of these activities occurred in temporal proximity to Loos's discharge. Loos served on the safety committee between 2007 and 2008, approximately five years prior to his dismissal. Likewise, the safety report documented in the record

---

[5]Although Loos cites to *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152 (3d Cir. 2013), which employs a more lenient standard, we explained in *Blackorby v. BNSF Railway Co.* that the Eighth Circuit follows *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786 (8th Cir. 2014), not *Araujo*. 849 F.3d at 721-22.

occurred in 2007.[6]  Loos reported his on-duty injury in 2010, almost two years prior to his dismissal, and he testified in the Peterson-Gunderson hearing approximately ten months prior to his dismissal.  By comparison, Loos's attendance violations began before the protected activities occurred and continued consistently until his discharge. *Kuduk* explained that more than a temporal proximity is required to find retaliatory motive "especially . . . when the employer was concerned about a problem before the employee engaged in the protected activity."  768 F.3d at 792 (quotation omitted). Here, not even temporal proximity is present, and BNSF's concern with Loos's attendance problems well predated the protected activities.  Moreover, the violation that prompted Loos's dismissal occurred because Loos missed a weekend day for personal reasons and, thus, the violation was unrelated to any protected activity.

The thrust of Loos's argument is that BNSF retaliated against him by refusing to allow him to use the ION code when his injury flared up.  Although using the ION code would not have prevented the 2012 attendance violation that ultimately prompted Loos's dismissal, it would have prevented his 2011 violations.[7]  Without the 2011 violations, Loos would not have had a sufficient number of active attendance violations to qualify for dismissal under the policy.[8]  Thus, the argument goes, if BNSF refused the ION code in retaliation for Loos reporting the injury, that

---

[6]Loos testified, and we assume as true for purposes of summary judgment, that he made other safety reports throughout his employment.  However, he does not assert or provide evidence that such reports occurred in close proximity to his firing.

[7]We take as true for purposes of summary judgment Loos's testimony that one or both of these violations were due to injury flare-ups for which BNSF denied the ION code.

[8]BNSF contends that Loos cannot now challenge his 2011 attendance violations because he admitted the violations and waived formal investigation, and the statute of limitations for such challenge has expired.  We need not decide this question, because even if we consider the 2011 violations Loos has not presented sufficient evidence of retaliatory motive.

retaliatory motive contributed to his dismissal. However, the evidence does not support the conclusion that BNSF acted with such a retaliatory motive.

When Loos requested to use the ION layoff code for flare-ups of his injury, the only medical documentation BNSF had was the letter from Loos's doctor releasing him to work without restriction. Loos did not provide any medical documentation until his September 2012 FMLA leave request and the November 2012 letter from his doctor explaining that flare-ups would have been occurring during May, June, and July of 2012. BNSF did not have either of these documents in 2011 when it refused the ION code. Rather, the information BNSF had at the time it refused the ION code indicated that Loos was fit for work without restriction.[9] *See Gunderson*, 850 F.3d at 969 ("The critical inquiry in a pretext analysis is . . . whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." (quotation omitted)). Loos fails to provide evidence that this reason is inconsistent or pretextual. First, Loos points to testimony asserting that BNSF allowed another employee—Jake Kluver—to use the ION code for absences due to flare-ups of an injury after he was released to work without restriction. However, Loos has not carried his burden to demonstrate that Kluver was "similarly situated in all relevant respects." *See Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994). Loos did not present evidence that Kluver failed to provide medical documentation, and without evidence to that effect we cannot conclude that Kluver was similarly situated in all relevant respects and, thus, that his experience demonstrates BNSF acted inconsistently.

Loos emphasizes the testimony of Mullins and Joyce, two former BNSF employees who asserted that BNSF unofficially stopped allowing the ION code for

---

[9]Loos also emphasizes that the jury verdict in his FELA claim, which awarded damages for pain, disability, and emotional distress for a period including the 2011 violations, confirms that Loos was attempting to take time off because of his injury. However, this does not illuminate BNSF's intent at the time it disciplined Loos.

injury flare-ups in 2000 when it instituted the attendance policy because of concerns its use would alter BNSF's injury-reporting obligations under FRSA.[10]  The district court did not consider Mullins's and Joyce's testimony because Loos failed to disclose them as experts at the appropriate time.  Loos does not expressly challenge this decision, but even if we consider Mullins's and Joyce's testimony, it does not support an inference of retaliatory motive.  If BNSF indeed had an across-the-board practice of disallowing the ION code for injury flare-ups, the denial in Loos's case would not be evidence that BNSF intended to retaliate against him specifically for protected activity.  As such, whether or not such a policy, if it existed, would be fair is not at issue here.  *See Gunderson*, 850 F.3d at 970 ("[I]f the discipline was wholly unrelated to protected activity . . . whether it was fairly imposed is not relevant to the FRSA causal analysis.").

Loos also points to a 2011 exchange between himself and Bailey, a supervisor, related to Loos's ION code request.  Loos testified that Bailey refused to authorize the ION code because it was not available to him.  When Loos pressed for further explanation, Bailey responded, "It's just not [available].  We don't do it anymore." This statement is susceptible to two interpretations.  On the one hand, it supports Mullins's and Joyce's testimony that BNSF categorically denied ION code use for flare-ups after 2000.  As described above, such a situation does not support an inference of retaliatory motive against Loos.  Second, the statement may be interpreted to mean that Loos could not use the ION code anymore because he had been released to work without restriction.  That interpretation, likewise, does not support an inference of retaliatory motive because it supports BNSF's explanation that it denied the ION code because Loos failed to provide the necessary medical documentation.  Next, Loos points to an exchange that took place in 2010 or 2011 between Phillip Mullen, the terminal superintendent, and Jeremy Brown, a BNSF switchman and the switchmen's union local chairman, in which Mullen expressed

[10]BNSF strongly contests this assertion.

-11-

significant frustration with Loos's low attendance during a monthly local chairmen's meeting. Nothing in the exchange implies that any scrutiny of Loos's attendance was a pretext to punish him for protected activities.

Loos's final argument with respect to the 2011 violations consists of the assertion that BNSF should have granted Loos FMLA leave in 2011, even though he was not eligible. This refusal to make a special exception to FMLA requirements, Loos contends, demonstrates retaliatory motive. We disagree. A railroad may refuse to make a policy exception without retaliatory motive, and Loos points to nothing else surrounding the FMLA denial that would indicate retaliatory motive drove that decision.

Likewise, the circumstances surrounding Loos's testimony in the Peterson-Gunderson hearing ultimately do not support an inference of retaliatory motive. After Loos testified at the hearing, he received an investigation notice for the day he missed to testify and Greg Jaeb, one of his supervisors, asked to see the subpoena. During the exchange, Jaeb opined that "this could be bad for you." Loos never produced the subpoena, and BNSF canceled the investigation. In order for Jaeb's statements to constitute evidence of retaliatory motive on the part of BNSF, there must be "proof that a supervisor 'perform[ed] an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action . . . if that act is a proximate cause of the ultimate employment action." *Gunderson*, 850 F.3d at 970 n.9 (alterations and omissions in original) (quoting *Kuduk*, 768 F.3d at 790). Even assuming it expresses retaliatory animus, no evidence in the record supports the conclusion that Jaeb's statement reflected the intent of BNSF or influenced the ultimate decision-maker. BNSF rescinded the investigation notice shortly after the exchange, and the attendance violation that led to Loos's dismissal was completely unrelated. Loos presented no evidence that Jaeb influenced John Wright, the BNSF investigator who presided over the November 2012 investigation hearing, or that the investigation itself resulted from Jaeb unfairly reporting Loos to superiors. *See*

*Ludlow v. BNSF Ry. Co.*, 788 F.3d 794, 802 (8th Cir. 2015) (finding state-law retaliation where hostile supervisors provided the only source of information to the decision-maker, who in turn rubber-stamped their recommendations); *Richardson v. Sugg*, 448 F.3d 1046, 1060 (8th Cir. 2006) (explaining that if a decision-maker "makes an independent determination as to whether an employee should be terminated and does not serve as a mere conduit for another's discriminatory motives," that person's discriminatory motive is not a contributing factor).

Finally, Loos points to two exchanges during the investigation hearing that he contends demonstrate his dismissal was "preordained" and driven by retaliatory motive. First, Loos argues that Wright was reluctant to admit into evidence Loos's September 2012 FMLA application and the November 6, 2012 doctor's note. This reluctance, Loos contends, demonstrates that the dismissal was "preordained." However, the record demonstrates that Wright merely questioned the relevance of medical documentation from September and November to a violation that occurred during May, June, and July. After stating this reservation, Wright admitted the evidence. The record does not support Loos's characterization of Wright's conduct as demonstrating he intended to discharge Loos regardless of what the evidence showed. Second, Loos points to an exchange between Loos's union representative, Jeff Pientka, and Wright. When Pientka harangued Wright at length for reasons unrelated to the subject of the investigation, Wright informed Loos that he would ask Loos to find a different union representative if Pientka could not refrain from disrupting the investigation. After Wright allowed Loos and Pientka a recess to confer, the investigation proceeded without further disruption. Loos characterizes this exchange as intimidating and evincing retaliatory intent, but the record does not support that conclusion.

In sum, the evidence does not raise a genuine dispute that retaliatory motive prompted by protected activity contributed to Loos's dismissal. As a result, Loos has

failed to make a *prima facie* case and, accordingly, we affirm the district court's decision to grant BNSF summary judgment on Loos's FRSA retaliation claim.

## B. RRTA Tax Withholding

In relation to Loos's succesful FELA claim, BNSF cross-appeals the district court's denial of its Rule 59(e) motion seeking to set off the amount of RRTA tax that it argues it is required to withhold and to remit from the portion of Loos's recovery designated for lost wages. The district court denied the requested offset, determining that the income tax exclusion for personal-injury awards, *see* 26 U.S.C. § 104(a)(2), excepted the award for lost wages from RRTA taxation. We review for an abuse of discretion a district court's denial of a Rule 59(e) motion to amend or alter the judgment. *Avon State Bank v. BancInsure, Inc.*, 787 F.3d 952, 959 (8th Cir. 2015). However, "where the Rule 59(e) motion seeks review of a purely legal question," *id.* at 959 n.3, "the district court abuses its discretion if it makes a legal error," *Am. Civil Liberties Union of Minn. v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088, 1093 (8th Cir. 2011).

The Railroad Retirement Act ("RRA"), 45 U.S.C. §§ 231-231v, is the railroad-industry equivalent to the Social Security Act ("SSA") and provides retirement benefits funded by employment taxes collected under the RRTA, 26 U.S.C. §§ 3201-02, 3211-12, 3221, 3231-33, 3341; *see Cowden v. BNSF Ry. Co.*, No. 4:08CV01534 ERW, 2014 WL 3096867, at *2 (E.D. Mo. July 7, 2014) (unpublished). The RRTA imposes two tiers of taxes, which are levied against both the employee and the employer based on the amount of the employee's compensation. *Cowden*, 2014 WL 3096867, at *2. Tier 1 taxes "are analogous to taxes imposed on nonrailroad workers by the Federal Insurance Contributions Act (FICA)." *Id.* Tier 2 taxes provide benefits similar to a private multi-employer pension fund. *Id.* (citing *Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 522 (6th Cir. 2009)). Though closely related, the RRA and RRTA are administered by separate administrative agencies (the Railroad

-14-

Retirement Board ("RRB") and the Internal Revenue Service ("IRS"), respectively), *see id.*, and operate under separate regulations, *compare* 20 C.F.R. §§ 201-206, 209-12, 216-22, 225-30, 232-38, 240, 243, 250, 255, 258-62, 266, 295 (implementing the RRA) *with* 26 C.F.R. §§ 31.3201-02, 31.3211-12, 31.3221, 31.3231 (implementing the RRTA).

Both the RRA and the RRTA define the term "compensation." *See* 45 U.S.C. § 231(h); 26 U.S.C. § 3231(e). The RRA defines "compensation" as "any form of money remuneration paid to an individual for services rendered as an employee to one or more employers . . . including remuneration paid for time lost as an employee." 45 U.S.C. § 231(h)(1). The RRA defines "pay for time lost" as "the amount [the employee] is paid by an employer with respect to an identifiable period of absence from the active service of the employer, including absence on account of personal injury." *Id.* § 231(h)(2). The RRB has interpreted that definition to encompass FELA judgment awards for lost wages and, thus, considers FELA judgment awards when calculating the employee's benefits. *See* Railroad Retirement Board, Railroad Retirement Service Credits and Pay for Time Lost 2 (2011).

The RRTA also defines "compensation" as "any form of money remuneration paid to an individual for services rendered as an employee to one or more employers" but does not expressly include pay for time lost. 26 U.S.C. § 3231(e)(1). The IRS interprets "compensation" under the RRTA as having "the same meaning as the term wages in [FICA] . . . except as specifically limited by the [RRTA] . . . or regulation." 26 C.F.R. § 31.3231(e)–1(a)(1). The regulation further provides that "[t]he term compensation is not confined to amounts paid for active service, but includes amounts paid for an identifiable period during which the employee is absent from the active service of the employer . . . as well as pay for time lost." *Id.* § 31.3231(e)–1(a)(3)-(4). Under this regulation, damages for lost wages fit well

within the definition of "compensation." Loos challenges this interpretation of the RRTA.

Under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, we must first determine whether "Congress has directly spoken to the precise question at issue." 467 U.S. 837, 842 (1984). If so, "that is the end of the matter: for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

Although damages for lost wages are a "form of money remuneration paid to an individual," the RRTA only considers such remuneration "compensation" if it is paid "for services rendered as an employee." In cases interpreting FICA, the Supreme Court has defined this concept broadly to refer to "not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer." *Social Sec. Bd. v. Nierotko*, 327 U.S. 358, 365-66 (1946) (deeming the SSA to cover back pay); *United States v. Quality Stores, Inc.*, 134 S. Ct. 1395, 1400 (2014) (relying on *Neirotko* to deem severance payments "wages" under FICA). However, we recently determined that the FICA definition cannot be imported into the RRTA because "instead of taxing payment for 'services,' the FICA taxes payment for 'employment,' which is defined broadly . . . ." *Union Pac. R.R. Co. v. United States*, No. 16-3574, slip op. at 12 (8th Cir. Aug. 1, 2017) (citing 26 U.S.C. § 3121(b)). Accordingly, we cannot rely upon cases interpreting the language of FICA to expand the RRTA's definition of "services rendered" to encompass the entire employee-employer relationship generally. *Id.*

Under the RRTA's plain text, damages for lost wages are not remuneration "for services rendered." Damages for lost wages are, by definition, remuneration for a

period of time during which the employee did not actually render any services. Instead, the damages compensate the employee for wages the employee should have earned had he been able to render services. Unlike FICA, the plain language of the RRTA refers to services that an employee actually renders, not to services that the employee would have rendered but could not. *See* 26 U.S.C. § 3231(e)(1); *see also id.* § 3231(d) (defining "service"). Thus, damages for lost wages do not fit within the plain meaning of the RRTA.

On the other hand, BNSF and the Government contend that the RRA and RRTA are *in pari materia*, and, thus, we should read the RRA definition of "compensation" into the RRTA. The RRA and RRTA, they argue, accomplish a unified purpose: the RRA provides benefits, while the RRTA funds them. Thus, because the RRA expressly considers pay for time lost in calculating benefits, it makes sense that the RRTA would tax pay for time lost to pay for those benefits. *See Phillips v. Chi. Cent. & Pac. R.R. Co.*, 853 N.W.2d 636, 649 (Iowa 2014); *accord Liberatore v. Monongahela Ry. Co.*, 140 A.3d 16, 29 (Sup. Ct. Pa. Apr. 7, 2016) (considering the RRA and RRTA *in pari materia*). However, "[g]iven these linguistic differences, the question here is not whether identical or similar words should be read *in pari materia* to mean the same thing. Rather, the question is whether Congress intended its different words to make a legal difference." *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62-63 (2006). That Congress expressly included pay for time lost in the RRA's definition of "compensation" yet omitted it from the RRTA's definition of "compensation" suggests that Congress did not intend the RRTA to include pay for time lost.

The history of the RRTA confirms that this difference is intentional. Prior to 1975, the RRTA's definition of "compensation" expressly included "pay for time lost," using language and structure identical to that of the RRA:

(1) The term "compensation" means any form of money remuneration earned by an individual for services rendered as an employee to one or more employers, or as an employee representative, *including remuneration paid for time lost as an employee*, but remuneration paid for time lost shall be deemed earned in the month in which such time is lost . . . .

(2) A payment made by an employer to an individual through the employer's payroll shall be presumed, in the absence of evidence to the contrary, to be compensation for service rendered by such individual as an employee of the employer in the period with respect to which the payment is made. *An employee shall be deemed to be paid "for time lost" the amount he is paid by an employer with respect to an identifiable period of absence from the active service of the employer, including absence on account of personal injury*, and the amount he is paid by the employer for loss of earnings resulting from his displacement to a less remunerative position or occupation. If a payment is made by an employer with respect to a personal injury and includes pay for time lost, the total payment shall be deemed to be paid for time lost unless, at the time of payment, a part of such payment is specifically apportioned to factors other than time lost, in which event only such part of the payment as is not so apportioned shall be deemed to be paid for time lost.

26 U.S.C. § 3231(e)(1), (2) (1970) (emphasis added). In 1975, Congress amended the RRTA to remove the express inclusion of "pay for time lost" within the definition of "compensation" in § 3231(e)(1), but it retained the definition of "pay for time lost" in § 3231(e)(2). *Cowden*, 2014 WL 3096867, at *5-6. In 1983, Congress further amended section 3231(e) to "remove[] all language addressing payments for time lost and for personal injury." *Id.* at *6. Thus, "[i]t is beyond dispute that the plain language of the RRTA once provided for payments for time lost on account of personal injury, but no longer does." *Phillips*, 853 N.W.2d at 647.

While BNSF and the Government's argument that the RRTA should tax what the RRA uses to calculate benefits makes sense as a statutory scheme, this was expressly the statutory scheme that existed before the 1983 amendments. We are not convinced that we should import from the RRA the very language Congress eliminated from the RRTA. While "under the *in pari materia* canon of statutory construction, statutes addressing the same subject matter generally should be read as if they were one law," *Wachovia Bank v. Schmidt*, 546 U.S. 303, 315-16 (2006) (quotation omitted), the relationship between the RRTA and the RRA does not require it, *see Hisquierdo v. Hisquierdo*, 439 U.S. 572, 575 (1979) (explaining that RRTA "taxes paid by and on behalf of an employee do not necessarily correlate with the benefits to which the employee may be entitled" under the RRA). Therefore, we conclude that we should not read the RRTA and the RRA *in pari materia* and that it is inappropriate to import the RRA's definition of "compensation" into the RRTA.

Accordingly, we conclude that the RRTA is unambiguous and does not include damages for lost wages within the definition of "compensation." Therefore, the regulations providing to the contrary receive no deference under *Chevron*, because "the agency[] must give effect to the unambiguously expressed intent of Congress."[11] 467 U.S. at 842-43. Because we affirm the district court's decision on this alternate basis, we need not consider whether it was correct that 26 U.S.C. § 104(a)(2) applies to the RRTA.

---

[11] We give no consideration to Revenue Ruling 85-97, 1985-2 C.B. 5, 1985 WL 287177 (1985), or Revenue Ruling 61-1, 1961-1 C.B. 14, 1996 WL 12630 (Jan. 1961), because neither revenue ruling is directly on point, and neither takes account of the 1983 amendments.

## III. Conclusion

For the foregoing reasons, we affirm both the district court's decision to grant summary judgment to BNSF on Loos's FRSA claim and its denial of BNSF's request for an offset from the lost-wages award.

—————————————————————